IN THE

U.S. DISTRICT COURT
FOR THE EASTERN DISTRICT OF PA.

Samuel B. Randolph, II.          JURY TRIAL
        Plaintiff,               DEMANDED

        V.                       C.A. No. 19-2231

John E. Wetzel, et. al.
        Defendants,



FILED
JAN 0 3 2020

## PLAINTIFF'S FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

Plaintiff, Samuel Randolph, for his first amended and supplemental complaint against defendants: John Wetzel, Tammy Ferguson, T. Fauber, Dr. Wiener (Medical Director), Dr. Hanicek, JEANINE Welsh (C.H.C.A.), Deputy J. Terra Deputy Sorber, Deputy Sipple, CO' Ellerbee, Captain Etta Williams, Lt. Fetter, CO' Karnizan, CO' McKevitts, CO' Fernandez, Sgt. Rivera, Lt. Davis Dr. Sarah ?, Nurse Dennis, Nurse Paul, Lt. Ridgely, (5) five member Cert team from 5-7-19, (5) five member Cert Team from 6-13-19, Sgt. Moyer, CO' Smothers, CO' Ms. Johnson, Nurse Mari CO' Belador, CO' Policki, Mr. Walsh Physician's Asst.

-2-

Chase M. Defelice, Sgt. Fondi, Ms. Savage, CO'Armstrong, Keri Moore, Mrs. Owens- Grievance Coordinator, Nurse Joey and Mr. Wright, as well as (2) Jane Doe nurses, from, 6-13-19 force feeding

## INTRODUCTION

1. This is a civil rights action filed by Samuel B. Randolph, IV., a state prisoner, for damages, declaratory and Injunctive relief under 42 U.S.C. §1983 relief, and alleging violations of his constitutional rights, due to excessive use of force, torturous and extreme isolation, cruel and harsh conditions of confinement, lack of adequate medical treatment/care, denial of access to mental health treatment and care, retaliation, INVASION PRIVACY emotional distress, deliberate indifference and violation of the Americans with Disabilities Act. The plaintiff also alleges the torts of assault and battery and negligence. The allegations violate the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution. The ongoing and extremely cruel/harsh isolation in permanent solitary confinement, is degrading, inhumane and also violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitutio

2.   This action seeks to stop the ongoing cruel and unusual punishments, torturous abuses / retaliatory assaults and discrimination toward plaintiff, due to his handicapped condition and sentence.

3. Plaintiff is permanently confined to a bed for 24-hours a day, and remains permanently isolated and locked in his cell for 24-hours a day, with _zero_ out-of-cell time for anything recreational program or activity, — including but not limited to : _no_ outside yard for exercise, fresh air or sunlight, _no_ showers, _no_ law library, or any other congregational program such as attending church / religious services, or eating meals / socializing with other prisoners in the dayroom.

4.  The defendants have kept plaintiff permanently isolated and confined in these cruel and harsh conditions for the past (10) ten consecutive years, — since May 200. Plaintiff is only taken out of his cell, for legal visits, court proceedings or medical or dental appointments.

− 4 −

5. The indefinite isolation and endless cycle of retaliatory abuse/punishment has had a negative impact on plaintiff's injuries and caused him to further deteriorate. Plaintiff is devoid of mental stimulation, with very limited and sporadic human interaction — such as the 2−3 seconds it normally takes someone to deliver plaintiff's food trays to his cell. Plaintiff is forced to eat all of his meals in a small and cramped cell, next to a toilet, in unsanitary conditions

6.   The ~~devasting~~ devastating effects of such prolonged and extremely cruel isolation are well known among mental health experts, physicians, and human rights experts in the United States and around the world. It is established beyond dispute that solitary confinement puts prisoners at risk of substantial physical, mental and emotional harm. In addition, some courts have also considered such extreme isolation as torture and abuse. In Davis v. Ayala, 135 S. Ct. 2187, 2210 (2015), Justice Anthony Kennedy noted ..."[Y]ears on end of near-total isolation exact a terrible price."

-5-

Justice Kennedy, also explained how inhumane isolation and solitary confinement was, and he further explained how... "Solitary confinement literally drives men mad."

7. These dehumanizing conditions are detrimental to plaintiff and have caused him serious, irreversible physical and psychological harm. Over time, plaintiff has ~~been~~ experienced a decline in his cognitive capacity and ability to effectively communicate. Prior to being forced into total isolation, by the defendants, plaintiff did NOT have any pre-existing mental illnesses. However, plaintiff's current mental illness has been exacerbated by isolated confinement and a direct result of his prolonged incarceration in solitary confinement.

8. Social interaction and meaningful activity are crucial to human well-being. By definition, solitary confinement isolates individuals and denies them mental, emotional

and environmental stimulation. However, in this instant matter plaintiff ~~will~~ will demonstrate how all of the above named defendants were personally involved in exacerbating plaintiff's isolation and extreme conditions of confinement and also did so in order to retaliate against plaintiff, and to force him to suffer/endure torturous harm/painfull abuse — not only physically but mentally/emotionally, as well.

9. Even healthy adults, if subjected to very short periods of isolation, display impaired neurological functioning. Here, the prolonged nature of the confinement has had, and continues to have, a devastating impact on plaintiff. Especially, since the isolation is ongoing and continuous, — since 5-18-09, and continuing to present date 12-26-19, (date of filing), and amounts to 10 years, 6 months and 8 days of torture. Several courts have agreed that 90-days of continued isolation amounts to torture.

10. There is no legitimate penological reason

-7-

to place plaintiff in solitary confinement,
and to keep plaintiff locked away and
isolated in such extreme conditions, for
over 10 1/2 consecutive years, and for
24-hours /day, seven days a week, and
without _ever_ providing plaintiff access to eve
_one_ shower, or without ever taking plaintiff
outside to the exercise yard, for fresh air
and sunlight.
The U.S. Dept. of Justice recommends the
use of solitary confinement _only_ when it
serves a specific penal purpose and when
accompanied by regular review by a
multi-disciplinary committee.
This extremely cruel and unusually harsh
conditions of plaintiff's confinement
violates the Eighth and Fourteenth
Amendments of the U.S. Constitution.
In addition, plaintiff's extreme isolation
is motivated by retaliatory abuse, which
also violates the First Amendment of
the U.S. Constitution, as well.

11. The defendants also attacked plaintiff,
shocked him numerous times unnecessarily

-8-

despite plaintiff's full compliance and non-resistence. The defendants then forcefully applied handcuffs/shackles and then forcefully slamming plaintiff into a restraint chair, and continued to torture plaintiff with an extremely painful taser/shocking device, again and again, despite plaintiff's full compliance and non resistance. The defendants then continued to torture plaintiff by force feeding plaintiff unnecessarily and despite plaintiff's full compliance. Prior to this force feeding procedure, plaintiff complied by voluntarily consuming (2) two plates of chicken, rice and beans, as well as two oranges. However, despite plaintiff's consumption of this food, the defendants still elected to force feed plaintiff unnecessarily, and to simply continuously torture plaintiff, and to cause extensive injuries, harm and excruciating pain/suffering, in order to retaliate against plaintiff, and to also "teach plaintiff a lesson". Further proof of the defendants' wilfull and

diabolical retaliation and torturous
abuse, is evinced and revealed by
how the forcefeeding procedure was
maliciously and unnecessarily performed
on plaintiff. In an attempt to
prevent this extremely dangerous and
painful procedure, plaintiff pled with the
defendants to allow him to simply drink
and swallow the food/fluids, instead of
it being forced into plaintiff unnecessarily.
Plaintiff was more than willing to comply,
since plaintiff already complied by
eating (2) plates of food, oranges and
water, only a few moments ago.
The defendants denied all of plaintiff's
request and stated that they would rather
force feed plaintiff instead.
The defendants then proceeded to
torture plaintiff again, by forcefully
shoving a nasogastric tube up plaintiff's
nose - both nostrils! The tube was too big
and wouldn't fit. However, the doctor
and security personnel instructed the nurse
to make it fit, and the nurse complied and
tortured plaintiff by shoving the tube up both

– 10 –

nostrils, which caused excruciating pain and severe injuries to plaintiff.

Force feeding is an overly intrusive procedure, which is extremely painful, dangerous and can possibly cause death.

Due to being force fed, plaintiff sustained significant injuries, that almost killed plaintiff, - including, but not limited to internal injuries / bleeding in nose / throat. The defendants also deliberately poured liquid into plaintiff's lungs, - which caused plaintiff to choke, vomit and suffocate. The defendants ignored plaintiff's attemps to convey / explain that he could NOT breathe. Despite the botched procedure the defendants refused to stop and continued to torture plaintiff unnecessarily, and did so deliberately. The defendants then denied plaintiff access to emergency medical treatment, after the botched force feeding procedure was completed.

12.  The defendants lied and fabricated plaintiff's true condition, in order to secure the court order / injunction to force feed plaintiff unnecessarily.

-11-

The sole purpose of force feeding is to preserve life. At no point in time was plaintiff ever in jeopardy of dying, as a result of plaintiff's decision to fast. In fact the defendant's knew full well that plaintiff was NOT suicidal, nor did plaintiff ever attempt to starve himself to death. Nevertheless, the defendants submitted ex-parte filings to a common pleas court, and not only fabricated plaintiff's health condition, but also argued the urgent need to force feed plaintiff, as if plaintiff was on death's doorstep, and the defendants needed to preserve plaintiff's life. Plaintiff made clear that he wasn't on a hunger-strike, in the traditional sense, where he refuses to consume any food. Although plaintiff refused to accept contaminated food from the defendants, plaintiff often consumes his own healthy/well balanced diet, which plaintiff purchases from the commissary. The defendants were

- 12 -

also aware, and readily admit that
defendant also fasted intermittently.
Intermittent fasting is conducted for
health reasons, and is proven to be
beneficial, for reducing radical
inflamation and/or keeping disease
at bay. Plaintiff also remained
extremely hydrated, which plaintiff's
blood and lab work confirmed.
Plaintiff also kept his cell stockpiled
with healthy food. The defendants
deliberately separated plaintiff from
his stockpiled food, and refused to
permit plaintiff to access his food.
The sole purpose of the defendants
seeking a court order / injunction to
force feed plaintiff was to utilize
the court's order, as a legal means
to torture plaintiff, and to teach
plaintiff a lesson. Although, the
court never intended the defendants
to misuse / abuse the injunction,
by force feeding plaintiff unnecessarily
the defendants did precisely that,
by separating plaintiff from his

- 13 -

Stockpiled food, and then denying plaintiff to access his own food. The defendants then falsely claimed that plaintiff was "hunger striking", although, plaintiff was not on a hunger strike.

13. Forcefeeding plaintiff unnecessarily, in that the force feeding wasn't conducted to 'preserve life', but was instead conducted in order to torture plaintiff and to teach plaintiff a lesson, with such retaliatory abuse violates the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution. The invasion of privacy and Due Process violation, is a Fourth and Fourteenth Amendment violation of the United States Constitution. Plaintiff also alleges the torts of assault and battery and negligence.

14. The defendants, who are employed by the Commonwealth of Pennsylvania,

- 14 -

have acted and are acting under color
of state law to deprive ~~plaintiffs~~
plaintiff his constitutionally protected
rights to be free of retaliation,
guaranteed by the First Amendment,
Invasion of Privacy, guaranteed by
the Fourth Amendment, Cruel and
*DELIBERATE INDIFFERENCE;
Unusual punishment, guaranteed by
the Eighth Amendment and to
Due Process of Law, guaranteed by
the Fourteenth Amendment, to
the United States Constitution.

15. Plaintiff seeks declaratory and
injunctive relief to address these
violations of his constitutional rights.
Plaintiff also seeks damages and
compensation, and an injunction also
requiring defendants to cease violating
the Eighth Amendment rights of
plaintiff and to provide plaintiff
with constitutionally adequate
medical treatment/care, including
surgery, and mental health treatment
and care, and to comply with

-15-

the ADA accommodations, and to protect plaintiff against dangerous and unconstitutional conditions of confinement.

## Jurisdiction And Venue

16. This court has jurisdiction over this action under U.S.C Sections 1331 and 1343. The matters in controversy arise under 42 U.S.C. Section 1983. This court also has supplemental (formerly "Pendent") jurisdiction for all state law claims, under 28 U.S.C 1367 and also, 42 Pa. C.S. 8522, The Commonwealth and/or any employees contracted there to have waived immunity with respect to claims against or of 42 Pa. C.S. 8522 and 8528.

17. Venue properly lies in this district pursuant to 28 U.S.C. Section 1391 (b), because the events giving rise to this cause of action occurred in this district.

-16-

## PARTIES

18. Plaintiff Samuel B. Randolph, IV., is and was, at all times mentioned herein, a prisoner of the state of Pennsylvania, in the custody of the Pa. Dept. of Corrections, at SCI-Phoenix, Box 244, Collegeville, Pa. 19426.

19. Defendant John E. Wetzel, is Secretary, of the Pa. Dept. of. Corrections. He is legally responsible for oversight, operation and administration of the Dept. of Corrections, and each institution under its jurisdiction,— including SCI-Phoenix. Additionally, defendant Wetzel determines rules, regulations and policy regarding management, personnel, and the overall operation of the Dept., including death row and segregation units. Defendant Wetzel, has personally witnessed plaintiff's disturbing conditions of confinement and isolation. Defendant Wetzel authorized and condoned the unconstitutional policy and plaintiff's housing/isolation,

in solitary confinement. Defendant Wetzel, has been and continues to be deliberately indifferent to these problems. Defendant Wetzel is also aware that the D.O.C.'s policies/practices caused great harm to plaintiff's physical and mental well-being. Therefore, defendant Wetzel directly and proximately has caused and continues to cause the constitutional violations set forth herein. At all relevant times, Defendant Wetzel was acting under color of state law and as an official representative of the Dept. Defendant Wetzel is sued in his official capacity for damages, declaratory and injunctive relief.

20. Defendant Tammy Ferguson, is the Superintendent of SCI-Phoenix, and she remains deliberately indifferent to the extremely deleterious effect of these policies/practices. She is responsible for the operation of SCI-Phoenix, and for the welfare of

-18-

all of the inmates of this institution. She is being sued in her individual and official capacity, for acts and omissions under color of state law.

21. T. Fauber, is the Unit Mgr., of death row, at SCI-Phoenix, and he is being sued in his individual and official capacity.

22. Dr. Wiener, is the Medical Director of SCI-Phoenix, he is being sued in his individual and official capacity.

23. Dr. Hanicek, is a doctor at SCI-Phoenix, he is being sued in his individual and official capacity.

JEANNE→ 24. ~~Genne~~ *defendant* Welsh, was the Chief Health Care Administrator at SCI-Phoenix, she is being sued in her individual and official capacity.

25. Defendant J. Terra, is the Deputy Superintendent at SCI-Phoenix, he is being sued in his individual/official capacity

-19-

26. Defendant Deputy Sorber, is a Deputy Superintendent, at SCI-Phoenix, he is being sued in his individual and official capacity.

27. Defendant Deputy Sipple, is a Deputy Superintendent at SCI-Phoenix, she is being sued in her individual and official capacity.

28. Defendant CO'Ellerbee, is a correctional officer at SCI-Phoenix, he is being sued in his individual and official capacity.

29. Defendant Etta Williams, is a Captain at SCI-Phoenix, she is being sued in her individual and official capacity.

30. Defendant Fetter, is a lieutenant at SCI-Phoenix, he is being sued in his individual and official capacity.

31. Defendant CO'Kamizan, is a correctional officer at SCI-Phoenix, he is being sued in his individual and official capacity

-20-

32. Defendant CO' McKevitts, is a correctional officer at SCI-Phoenix, he is being sued in his individual and official capacity.

33. Defendant Co' Fernandez, is a correctional officer at SCI-Phoenix, he is being sued in his individual and official capacity.

34. Defendant Sgt. Rivera, is a correctional officer at SCI-Phoenix, he is being sued in his individual and official capacity.

35. Defendant Lt. Davis, is a lieutenant at SCI-Phoenix, he is being sued in his individual and official capacity.

36. Defendant Dr. Sarah, is a doctor at SCI-Phoenix, she is being sued in her individual and official capacity.

37. Defendant Nurse Dennis, is a nurse at SCI-Phoenix, he is being sued in his individual and official capacity.

- 21 -

38. Defendant Nurse Paul, is a nurse at SCI-Phoenix, he is being sued in his individual and official capacity.

39. Defendant Lt. Ridgely, is a lieutenant at SCI-Phoenix, he is being sued in his individual and official capacity.

40. Defendants (5) five member Cert Team from 5-7-19, at SCI-Phoenix. These defendants are being sued in their individual and official capacity.

41. Defendants (5) five member Cert Team from 6-13-19, at SCI-Phoenix. These defendants are being sued in their individual and official capacity.

42. Defendant Sgt. Moyer, is a correctional officer at SCI-Phoenix, he is being sued in his individual and official capacity

43. Defendant CO'Smothers, is a correctional officer at SCI-Phoenix, he is being sued in his individual and official capacity.

-22-

44. Defendant CO' Ms. Johnson, is an officer at SCI-Phoenix, she is being sued in her individual and official capacity.

45. Defendant CO' Belador, is a correctional officer at SCI-Phoenix, he is being sued in his individual and official capacity.

46. Defendant Policki, is a correctional officer at SCI-Phoenix, he is being sued in his individual and official capacity.

47. Defendant Mr. Walsh, is a physician's assistant at SCI-Phoenix, he is being sued in his individual and official capacity.

48. Defendant Chase M. Defelice, is a lawyer for the PA. Dept. of Corrections, he is being sued in his individual and official capacity.

49. Defendant Sgt. Fondi, is a correctional officer at SCI-Phoenix, he is being sued in his individual and official capacity.

- 23 -

50. Defendant Ms. Savage, is the Chief Health Care Administrator at SCI-Phoenix, she is being sued in her individual and official capacity.

51. Defendant CO'Armstrong, is a correctional officer at SCI Phoenix, he is being sued in his individual and official capacity.

52. Defendant Keri Moore, is a grievance coordinator for the Secretary's Office of grievance appeals, located in Central Office, for the PA. Dept. of Corrections, in Mechanicsburg, PA, she is being sued in her individual and official capacity.

53. Defendant Mrs. Owens, is a grievance coordinator, for SCI-Phoenix, she is being sued in her individual and official capacity.

54. Defendant Nurse Joey, is a nurse at SCI-Phoenix, he is being sued in his individual and official capacity.

-24-

55. Defendant Mr. Wright, is a counselor for death row at SCI Phoenix, he is being sued in his individual and official capacity.

(Being sued in INDIVIDUAL & OFFICIAL CAPACITY

* NOTE: (2) JANE DOE NURSES FROM 6-13-19 FORCEFEEDING.

## FACTS / STATEMENT OF CLAIMS

56. At all times relevant to the events mentioned and described in this complaint, all of the defendants have acted and continue to act under color of state law.

57. All of the claims, questions of law and facts are common and related to all defendants, and are all part of the same series of continuing transactions and occurrences. Plaintiff requires constant ADA accommodations, for his physical and mental health needs, which the defendants continuously deny.

58. Plaintiff incorporates herein by reference, paragraphs and facts contained in plaintiff's previously filed

; hand written complaints / paragraphs - Dated 5-15-1 AND "Order to show cause and temporary restraining order"; "Memorandum of law in support of plaintiff's Motion for Temporary Restraining Order and/or Preliminary Injunction" and "Plaintiff's declaration in Support of Plaintiff's Emergency Motion For A Temporary Restraining Order And Preliminary Injunction"; - which were previously filed on May 5th, 2019.

59. Plaintiff still seeks the Emergency Motion For A Temporary Restraining Order and Preliminary Injunction to prevent the defendants from torturing plaintiff any further, by force feeding plaintiff unnecessarily. The defendants currently have a permanent injunction to force feed plaintiff, which the defendants are utilizing as a means to torture plaintiff. At no point in time has plaintiff _ever_ been suicidal, nor has plaintiff ever attempted to

-26-

starve himself to death. Plaintiff
simply prefers to eat his own food,
which plaintiff purchases from
the commissary, or an outside
vendor, rather than consuming
contaminated food provided by
the defendants. Due to the ongoing
harassment and retaliation, the
defendants have spit in plaintiff's
food, or provided plaintiff with
contaminated food, which caused
plaintiff to become ill on more than
one occasion.
The defendants must not be permitted
to torture plaintiff by force-feeding
plaintiff unnecessarily, simply because
the defendants loathe plaintiff and
desire to retaliate and force plaintiff
to endure extremely painful suffering.
The defendants have also nearly
caused plaintiff's death, by
force-feeding plaintiff on several
occasions. The defendants are
deliberately forcing fluids into
plaintiff's lungs. Not only is

- 27 -

this extremely painful, but the
defendants are essentially
suffocating and drowning
plaintiff. The defendants are
retaliating with the forcefeeding
as a way to "teach plaintiff
a lesson".
Forcefeeding should only be
utilized to "preserve life", and
not as a device for torture.

60. Plaintiff is being subjected to
permanent / indefinite isolation
in solitary confinement, with
( 0 ) zero out-of-cell time, for
showers, exercise, or any other
program or activity. Plaintiff's
mental health has deteriorated, since
being permanently locked in a cell
for over 10 ½ years, - consecutively,
since May 2009. Plaintiff is also
forced to reside in unsanitary
conditions, as well as consume all
of his meals in unsanitary
conditions - adjacent to and in very

-28-

close proximity to a toilet.

61. Plaintiff is permanently confined to a bed, and remains on his bed 24-hours a day, for seven days a week. The only time plaintiff leaves his cell is for legal visits, court proceedings or medical appointments. Whenever, plaintiff leaves the cell, he must be transported via gurney.

62. Plaintiff has several injuries to his legs and spinal cord, which prevent plaintiff from walking or utilizing a wheelchair. The defendants caused all of plaintiff's injuries, by assaulting plaintiff, and allowing plaintiff's condition to languish and deteriorate, since May 2009.

63. Plaintiff's mental health has deteriorated. However, the defendants refuse to provide plaintiff with any meaningful mental health treatment and care, and often

-29-

ignore or deny plaintiff's request for
mental health treatment and care.

64. Plaintiff is being subjected to an
endless cycle of torture and abuse
in which the extreme form of isolation
worsens his mental health and physical
well being. The defendants consciously
disregards the severe harm that the
Pa. D.O.C.'s policies / practices
continue to inflict upon plaintiff's
injuries and need for mental health
treatment and care.

65. Plaintiff receives very little human
interaction. Whenever, plaintiff's door
opens up, the defendants quickly close
it again in order to keep plaintiff isolated.
The defendants also fabricate paperwork
and daily logs to make it appear as
though plaintiff is "refusing" to
come out of his cell or participate.
However, plaintiff never 'refuses' and
request's showers, yard, dayroom, etc.
every single day and his requests are denied

- 30 -

66. Plaintiff has specifically requested mental health treatment and care from the defendants, pertaining to plaintiff's deteriorating mental health issues. Plaintiff requires psycho social rehabilitation services as part of the treatment, such as structured out-of-cell activities specifically designed to decrease / eliminate the permanent isolation, and to increase social interaction, and to also provide other forms of mental health treatment and care designed to help plaintiff recover from his injuries. All of plaintiff's requests were again denied or ignored altogether.

67. The defendants caused plaintiff to suffer devastating injury to his mental health, by isolating and forcing plaintiff to suffer torturous abuse, (as described more fully herein), and then denying plaintiff access to treatment for his injuries/needs.

-31-

68. Abundant psychiatric literature spanning nearly two hundred years, has documented the severely deleterious effect of isolation on mental health. Isolation is predictably damaging to prisoners and poses a grave risk of exacerbation of mental health symptoms and needs, such as anxiety, hypersensitivity, difficulty with concentration and memory, insomnia, social withdrawal, hopelessness, depression and being deprived of social interaction and visitation with friends/family, which is essential to help keep plaintiff focused.

Plaintiff currently suffers with/from every single one of these symptoms/condition, due to the defendants keeping plaintiff permanently isolated in an endless cycle of torture and abuse.

The defendants continue to remain deliberately indifferent to the impact

-32-

▄▄▄ that the extreme isolation and torturous abuses continue to have on plaintiff's mental health care needs.

69. The defendants were made aware of all of these effects, through the numerous grievances and requests that plaintiff filed/submitted. Plaintiff also appealed these grievances denials/requests. However, the defendants remain deliberately indifferent to these effects and the inadequate access to mental health services.

70. Although, the Pa. Dept. of Corrections has acknowledge the detrimental effects of isolation, and has since changed some of its policies, the defendants refuse to apply these new changes to plaintiff. The defendants have no intention of changing/correcting plaintiff's isolation, and refuse to include plaintiff, or allow plaintiff to benefit from any new policy.

71. On February 19, 2019, plaintiff arrived at SCI-Phoenix. Plaintiff was transferred from SCI-Greene, and was transferred via gurney and ambulance transport. Due to plaintiff's spinal cord, back and leg injuries / nerve damage, plaintiff is unable to utilize a wheelchair. Hence, the gurney and ambulance transports.

72. Upon arrival, plaintiff was immediately placed in isolation and solitary confinement, in a handicapped cell. The housing and isolated conditions were identical to plaintiff's previous isolation and conditions of confinement from SCI-Greene.

73. A few days after plaintiff arrived at SCI-Phoenix, the defendants, (Superintendent Ferguson and Unit Mgr. Mr. T. Fauber), arrived at plaintiff's cell. At this time,

- 34-

these two defendants explained
to plaintiff that he would be
treated the same way he was treated
at SCI-Greene, until he 'complied
with their directives'. In
response, plaintiff explained
how he was being tortured and
retaliated against, for filing his
lawsuits and refusing to consume
contaminated food. Plaintiff then
explained that he was not on a
hunger strike, and that plaintiff
simply prefers to consume food
that he purchases from commissary
or that plaintiff's family purchases
from a vendor —(Access Food Package,
Defendant Ferguson, then told
plaintiff that his food tray wouldn't
be spit in, or contaminated.
Defendant Ferguson, then told
plaintiff to accept a food tray to
establish that he wasn't on a hunger strike.
~~Plaintiff~~ Plaintiff then complied
and agreed to accept the food
trays, providing they remained free

-35-

of any contaminants.

74. During this same meeting, plaintiff requested a shower, to be taken outside for fresh air, sunlight and exercise. Plaintiff then explained that it has been over 10 years since he had a shower, or was taken outside. In response, both defendants, (Supt. Ferguson and Mr. Fauber), explained that they were aware of plaintiff's handicap. However, plaintiff would not be accommodated, until he agreed to force himself into a wheelchair. Plaintiff then explained his injuries and inability to utilize a wheelchair, hence the gurney transports. The defendants then denied all of plaintiff's requests and walked away from plaintiff's cell.

75. Approximately a few weeks after plaintiff arrived at SCI-Phoenix,

-36-

several officers, (all previous defendants
that plaintiff sued), began to
harass and retaliate against plaintiff.

76. During the month of March 2019,
defendant Karnizan, (one of the
previous defendants plaintiff sued),
arrived to plaintiff's door at
approximately 6:15 a.m.. At this
time, defendant Karnizan, banged
on plaintiff's door to arouse plaintiff
from his sleep. Defendant Karnizan,
then asked plaintiff if he remembered
the defendant? Plaintiff responded
and stated that he did not recognize
this defendant. Defendant Karnizan,
then said... "Yes you do! You know
exactly who I am, because you
sued me". Defendant Karnizan, then
told plaintiff that he was assigned
to work on the pod, where plaintiff
was housed, so plaintiff would
see him a lot. Plaintiff then stated
that he wasn't looking for trouble,
and he just wanted to be left alone.

Defendant Karnizan, then said..."it's a little too late for that, you should've thought about that before you filed those lawsuits," Defendant Karnizan, then glared at plaintiff and walked away.

77. In the passing days and weeks, during the months of March and April, Defendant Karnizan, was assigned to work on plaintiff's housing unit,—which defendant Karnizan, normally would work several days a week. During these times, defendant Karnizan would harass and retaliate against plaintiff in different ways. For example, this defendant would deny plaintiff access to the telephone, or interfere with plaintiff's mail. This defendant would also open/unwrap plaintiff's food trays. Normally, plaintiff's trays would arrive wrapped and sealed in cellophane, to ensure

- 38 -

plaintiff that his food wasn't
contaminated, spit in or
tampered with.
Defendant Kamizan, knew plaintiff
wouldn't accept/consume food
trays that were unwrapped open,
so defendant Kamizan, would
deliberately open plaintiff's trays.

78. Plaintiff wrote several grievances,
requests, or made verbal complaints
to Supt. Ferguson, Deputy Terra,
Lt. Ridgely, regarding defendant
Kamizan's retaliatory abuse. Plaintiff,
also filed complaints against other
officers that were engaging in this
harassment and retaliatory abuse.
However, despite plaintiff's
complaints, nobody intervened
to put an end to this ongoing
behavior.

79. On the morning of May 7, 2019,
the following defendants: CO'Kamizan,
CO'McKevitts and Lt. Ridgely, instigated

yet another retaliatory incident by engaging plaintiff into an altercation. Defendant Karnizan, initiated this incident by denying plaintiff access to the phone. Plaintiff previously arranged a legal call to his lawyer's office. Plaintiff requested the phone several times, and the defendants refused to permit plaintiff to make his legal call. Defendant McKevitts, also told Co'Karnizan, not to provide plaintiff with the telephone.

At approximately 8:30 am, on this same day, the same three defendants: (Karnizan, McKevitts and Ridgely) arrived to plaintiff's cell and opened plaintiff's door. At this time, plaintiff explained to lieutenant Ridgely, the supervising officer, that he had to make an urgent legal call, and officer Karnizan and Co'McKevitts, were denying plaintiff access to the phone.

- 40 -

80. As plaintiff was explaining the matter/situation to defendant Ridgely, defendant McKevitts, interupted and commenced to threatening to attack and harm plaintiff. Defendant McKevitts began to shout and holler, and stated,,, " I'll knock you the fuck out." Defendant McKevitts, repeated this threat several times, and told plaintiff to stand up. Plaintiff's bed/mattress was positioned directly in front of the door, so when these defendants opened plaintiff's door, defendant McKevitts, was hovering directly over plaintiff, and threatening to attack/harm plaintiff.

81.   Plaintiff was previously attacked and injured, by officers, on more than one occasion. Plaintiff perceived this threat to be real and feared defendant McKevitts was about to attack and strike plaintiff. Defendant

- 41 -

(McKevitts,)
has a reputation for attacking and
assaulting individuals. Defendant
McKevitts, is a professionally trained
fighter, kick boxer and mixed-martial
artist — AKA "MMA - Fighter".
Due to his experience and fighting
skill, the defendants often call
on defendant McKevitts, to
'take the lead'. Defendant McKevitts,
is also an active Cert team member
and he has attacked, assaulted and
injured prisoners in the past,

82. The defendants were NOT
suppose to open/enter plaintiff's
cell on this day, and had no
reason for doing this. In
response to these defendants'
actions, plaintiff also shouted
and told the defendants to
shut his door and leave him alone.
However, the defendants refused
to leave and defendant McKevitts
continued to threaten plaintiff
with bodily harm. Plaintiff then

- 42 -

threw some water, and told plaintiffs
to shut his door.

83. Approximately 30-minutes after
this incident, defendants, (Ridgely
and Capt. Williams), arrived to
plaintiff's cell. At this time, plaintiff
explained all that occurred, including
defendant McKevitts, threatening to
attack, harm and knock plaintiff
unconscious. Plaintiff also requested
defendant Williams, to review
to review the video surveillance
system / footage, which recorded
this entire incident.

84. After this incident occurred,
the three defendants involved, (Karnizan,
McKevitts and Ridgely), all filed
fabricated misconduct and incident
reports against plaintiff. The defendants
all lied and blamed the entire incident
on plaintiff. These defendants also
covered-up and lied about McKevitts
threatening to attack / harm plaintiff.

-43-

85. Officers are not permitted to threaten to attack prisoners, and it's a violation of PA, D.O.C policy/procedure, and code of ethics, - which is why the officers lied, to cover up and omit the true facts.

86. At approximately, 1:00 pm, on 5-7-19, defendant Ridgely, returned to plaintiff's cell, with (5) five Cert Team members in tow, Defendant Ridgely, entered plaintiff's cell, and asked plaintiff if he would comply, with being transported to the hole, for the misconduct plaintiff received, regarding the 8:30 am incident. Plaintiff explained to Lt. Ridgely, that he "absolutely" intended to fully comply, and wouldn't offer any resistance. Def. Ridgely, was recording this entire incident on hand-held video camera. Def. Ridgely, then had plaintiff handcuffed and shackled,

87. The video of this incident clearly demonstrates that plaintiff is complying with _all_ orders, and never resisted — _not even once_!

88. It is a violation of D.O.C. policy to use _force_ on an individual that is _complying_ and offering _no_ resistence. The use of force _must_ be _justified_.

89. The video will show that once these defendants handcuffed/shackled plaintiff, they then used force on plaintiff unnecessarily, by assaulting plaintiff and deliberately trying to smash/stuff plaintiff into a restraint chair. However, a restraint chair was never necessary because plaintiff was complying. All the defendants had to do was call for plaintiff's gurney — which is how plaintiff is transported everywhere; and has been utilizing gurney transports for the past (10) ten years.

- 45 -

90. The defendants were fully aware that plaintiff could NOT be placed into a restraint chair, due to his spinal cord and leg injuries.

91. Upon information and belief, the following defendants specifically authorized and ordered defendant Ridgely to use force on plaintiff, and to do so in order to retaliate and cause injuries and harm to plaintiff, (Ferguson, Terra, Capt. Williams).

92. Once Ridgely, had plaintiff handcuffed and shackled, defendant Ridgely, then explained that he was "only acting on the specific orders given", and he had to follow these orders. Plaintiff again explained his full compliance and non-resistance, and how the use of force was unnecessary. Plaintiff again requested his gurney transport, which Ridgely denied. Ridgely again reiterated his "orders received". Lt. Ridgely, then

- 46 -

instructed the (5) Cert Team members,
along with Nurse Dennis and Nurse
Paul, to pick plaintiff up and
stuff him into the restraint chair.
All (7) seven of these defendants
then grabbed plaintiff and placed
plaintiff in restraint chair.
However, due to plaintiff's injuries,
plaintiff cannot properly bend his
spine / legs. Plaintiff began to
scream / holler, due to the
excruciating pain plaintiff was
experiencing. Despite plaintiff's
obvious pain, the defendants
continued to attempt to <u>force</u>
plaintiff into the restraint chair,
by pushing, stuffing and cramming
plaintiff into the chair. These
defendants continued to assault
and injure plaintiff in this manner
for approximately (15) fifteen
minutes, but were not successful - PUTTING
PLAINTIFF IN
THE CHAIR.

93. Defendant Ridgely, then radioed
to central command, and his superior

officers, to inform them that plaintiff couldn't be forced into the restraint chair, due to plaintiff's existing injuries. Defendant Ridgely, then requested plaintiff's gurney transport, and explained that plaintiff is being injured and is in excruciating pain. These superior officers denied defendant Ridgely's requests, and again ordered/directed Lt. Ridgely to "force and smash his ass into the chair". The superior officers are identified as : Supt. Ferguson, Dep. Sipple, Deputy Terra, Deputy Sorber and Captain Etta Williams.

94. Defendant Ridgely, again directed the (7) seven defendents to force, and smash plaintiff into the restraint chair. This unnecessary force/assault went on again, for approximately 10-15 additional minutes. Plaintiff again was screaming/yelling and shouting that they were injuring his spine worse. Plaintiff then requested the nurses to

- 48 -

intervene and explain how they were injuring plaintiff. After this second attempt was unsuccessful, defendant Ridgely, told these seven defendants to finally stop.

95. Defendant Ridgely, again radioed into central command, and his superior officers to explain how the restraint chair couldn't be utilized, due to plaintiff's injuries/pain. Defendant Ridgely, again explained that plaintiff remained compliant at all times. Lastly, defendant Ridgely, again requested plaintiff's normal gurney transport, and the defendants finally relented and sent plaintiff's gurney. However, the damage and injuries were already done, — which was the defendant's ultimate objective — to retaliate and harm plaintiff. See and review video of entire incident.

96. After being transported to the hole on this day, plaintiff was stripped naked and placed on the floor. Plaintiff was

- 49 -

in excruciating pain, and requested medical treatment and care. However, none of these defendants provided plaintiff with access to medical treatment. Plaintiff remained in this condition on the floor for several days.

97. Due to plaintiff's injuries and pain, plaintiff could not move or eat.

98. On or about 5-9-19, defendant, Deputy J. Terra, came to plaintiff's cell in the hole. At this time, plaintiff explained his urgent need for medical treatment and care. Plaintiff also explained how he was assaulted, injured unecessary, by the excessive use of force. Defendant Terra, simply laughed and said... who do you think ordered it?" Defendant Terra, then threatened to order the very same assault again.

99. On May 14, 2019, the defendants retaliated against plaintiff, by placing plaintiff in a Psychiatric Observation Cell.

Plaintiff was placed on the floor and forced to remain in the unsanitary conditions on the floor for over a month. Plaintiff was also denied medical treatment and care, for the painful injuries plaintiff sustained on 5-7-19, when the defendants assaulted. The following defendants were responsible for the retaliatory placement in a psychiatric observation and the deliberate indifference to plaintiff's medical treatment and care: Ferguson, J. Terra, Dep. Sibber Dep. Sipple, John Wetzel, Capt. Etta Williams, Jeanne Welsh, Dr. Wiener, Dr. Sarah, Mr. Walsh (Physician's Assistant), Ms. Savage, Chase M. Defelice, Keri Moore, Mrs. Owens, Mr. Fauber and Mr. Wright.

100. While remaining housed in the "P.O.C", (psychiatric Observation Cell), plaintiff could not gain access to his stockpiled food items. Due to the defendants retaliation, plaintiff did not consume food from the defendants, which plaintiff did believe was contaminated. Plaintiff did drink voluminous amounts of water, several times

– 51 –

per day, in order to remain hydrated, while plaintiff conducted his <u>intermittent fasting</u>.

101. Although the defendants were aware that plaintiff often conducts <u>intermittent fasting</u>, and that plaintiff simply prefers to eat his own food that plaintiff purchases from either commissary or from an outside vendor – "Access Food Secure Pack", the defendants falsified/fabricated a 'hunger-strike'. However, plaintiff was <u>not</u> on a hunger strike. In fact, plaintiff specifically requested the defendants to bring his <u>healthy</u> stockpiled items, such as fish, vegetables, fruit, rice, peanut butter, nuts, trail mix, sausage, beef stew and brown rice, so that plaintiff could consume it and also establishing that plaintiff was <u>not</u> on a hunger strike - Plaintiff's stockpiled items consists of a healthy well-balanced diet, and <u>not</u> simply junk food such as chips, cookies and candy.

-52-

However, the aboved named defendants, officers, staff from security, and the medical defendants all <u>refused</u> to provide plaintiff his food, and instead insisted that plaintiff consume "their <u>food</u>", or <u>no</u> food at all. These above named defendants then <u>lied</u>, by falsely claiming that plaintiff was not only hunger striking, ~~but~~ but also attempting to commit suicide, by starving himself to death.

102. On May 5, 2019, plaintiff submitted an 'Emergency Motion' for Temporary Restraining Order and Preliminary Injunction (among other filings). Plaintiff submitted these emergency filings to prevent the defendants from <u>torturing</u> plaintiff, by force feeding plaintiff unnecessarily. See docket, initial filings and date.

103. Once the defendants became aware plaintiff initiated his filings in federal court, in order to prevent the defendants from torturing him, the

-53-

defendants then tried to undermine
plaintiff's federal litigation, by filing
secret, Ex-parte filings in
Montgomery County Common Pleas
Court, - Attached as Exhibits A-H.
The defendants clearly knew that
their actions were illegal and
prohibited under state and federal, -
including, but not limited to
' The First File Rule'. Plaintiff
clearly initiated his action First,
Furthermore, the Common Pleas
Court DID NOT HAVE Jurisdiction !
Moreover, the issue being litigated
is a federal issue and not a
state issue. The Common Pleas
Court of Montgomery County,
should have deferred/referred, sent
the issue/litigation back to federal
Court.

104. On May 22, 2019, the PA.
Dept. of Corrections, by and
through counsel, Chase M.
DeFelice, and in response to

plaintiff's instant action and
litigation, filed his responsive
lawsuit/countersuit.
Although, Mr. Defelice, is clearly
familiar with the rules of court
and state/federal law, he diliberately
disregarded these rules/laws in order
to undermine plaintiff's litigation.
Even worse, is the fact that
Mr. Defelice's filings are malicious
and riddled with falsehoods.
See and review entire state court
filing, (attached as Exhibits A - H).
Mr. Defelice's are clearly intended
to mislead the court into believing
that plaintiff's condition is so
grave, that plaintiff is on his
death bed, and he needed to be
forcefed in order to preserve
plaintiff's life. In order to
achieve this goal/end, Mr. Defelice
conspired with his colleagues and
co-defendants to falsify and
fabricate plaintiff's true condition.

- 55 -

105. At no point in time was plaintiff ever on his death bed, or even remotely close to being on death's door step. Therefore, plaintiff never needed to be forcefed. The defendants didn't force feed plaintiff in order to save/preserve plaintiff's life. The sole purpose of forcefeeding plaintiff was to TORTURE plaintiff, and to "teach plaintiff a lesson", because the defendants loathe plaintiff.

106. The defendants lied and deliberately misapplied caselaw, as well. See Exhibit C - 'Motion For Preliminary Injunction'. In paragraph 3, the defendants cited Com. of Pa, Dept. of Public Welfare, Farview State Hospital v. Joseph Kallinger, 580 A.2d 887 (1990). The defendants argued/misapplied this case, as well as the facts of the case, in order to argue that they had..." a clear right to administer ongoing involuntary medical, including nutrition and hydration",

- 56 -

However, the defendants possess no clear right at all.

This case is being misapplied to plaintiff's situation. For example, plaintiff is NOT suicidal, nor is plaintiff attempting to starve himself to death. In addition, plaintiff hasn't been diagnosed with any mental illness. Plaintiff was also remaining hydrated and drinking voluminous amounts of water — which the defendants clearly knew! The defendants also were clearly aware that plaintiff was not hungerstriking, but simply couldn't gain access to his stockpiled food. The facts will demonstrate that plaintiff made numerous requests to access his food, in order to prove that he was not hungerstriking. The defendants denied every single request plaintiff made to access his food that he had stockpiled in his cell. The defendants denied plaintiff's requests, in order to retaliate and torture plaintiff, by force feeding him instead.

– 57 –

107. On May 23, 2019, the Common Pleas Judge conducted a hearing. See video/transcript of hearing. During the hearing the defendants denied plaintiff access to his legal supplies, and did so in order to prevent plaintiff from litigating, and demonstrating that plaintiff was <u>NOT</u> on his death bed, and more importantly, plaintiff did <u>not</u> need to be forcefed.

Instead of permitting plaintiff to argue his case, the defendants kept plaintiff handcuffed, shackled and tightly belted to the gurney, so that plaintiff couldn't even move or turn to see the judge on the screen. Plaintiff, asked the court to move the unnecessary restraints, so that plaintiff could make his case, but the court denied the request. Plaintiff also asked to retrieve the argument he prepared to argue, including case law. However, this request was denied as well. Plaintiff, then requested the court to appoint counsel for plaintiff, since plaintiff was being prevented from arguing

-58-

his case. The court denied this request as well. In fact, the court denied all of plaintiff's requests.

Plaintiff also explained to the court that plaintiff filed his case First, in U.S. District Court. Plaintiff then requested the Common Pleas Court to defer and send the matter back to federal court. Lastly, plaintiff explained to the court that he (plaintiff) was raising a federal claim/question — 1st and 8th Amendment claims, and Due Process 14th Amendment as well. The court again denied plaintiff's requests.

At the conclusion of the hearing, the court then granted a permanent injunction.

108. On or about 5 pm, on this same day, the defendant, Deputy Sipple, came plaintiff's cell to gloat and taunt plaintiff, Deputy Sipple, laughed and celebrated, by waiving the signed order in front of plaintiff, as she sat directly in front of plaintiff's door. Deputy Sipple, then said ... "now we can force feed you whenever we want to.

– 59 –

109. At this time, plaintiff explained to Deputy Sipple that they lied and misled the court in order to secure the order. Plaintiff also requested access to his legal materials, so that plaintiff could appeal the court's order and also litigate his other pending pro se matters. The deputy denied plaintiff's requests to access his legal materials. All of plaintiff's legal property and materials were confiscated and placed in storage – including plaintiff's typewriter.

110. After the defendants secured the order to forcefeed plaintiff, Defendant Dr. Wiener, would often come to plaintiff's cell to conduct examinations of plaintiff's vital signs, and would also order bloodwork to monitor plaintiff's health. Dr. Wiener, would explain the results, as well. Dr. Wiener, explained that plaintiff's bloodwork established no cause for immediate concern — mainly due to the water that plaintiff was ▓▓▓▓ to remain hydrated. drinking

- 60 -

111. Approximately a week prior to
plaintiff being forcefed and tortured,
(during the week of June 9, 2019),
Dr. Wiener, entered plaintiff's cell
to discuss the impending force feeding
procedure. At this time, Dr. Wiener,
explained that the security team and
top administrators were "pressuring"
him to force feed plaintiff.
Plaintiff explained that he didn't need
to be forcefed, and it's illegal to force
feed someone unnecessarily. Plaintiff
also explained that these defendants
only want to torture plaintiff. Plaintiff
then explained that Dr. Wiener, does not
have to defer to these officers/staff,
especially, since they have zero medical
training/skill. In response, Dr. Wiener,
stated he understood what I was
explaining; however, they were "pressuring"
him to do it anyway. Dr. Wiener, went
on to explain that he often met with
these officers/staff members to discuss
my case/status, or they would often
call him on the phone, as well. The

– 61 –

defendants that Dr. Wiener is meeting with and/or receiving phone calls from, regarding my case/status are : Tammy Ferguson, Joe Terra, Deputy Sorber, Deputy Sipple, Mr. Fauber and Captain Williams, In addition to these officers and staff, Ms. Jeanne Welsh, was directly involved in the decision making process, regarding the force feeding.

112. On June 13, 2019, the defendants force fed and TORTURED plaintiff unnecessarily.
At approximately 7:00 am, the psychiatrist for SCI-Phoenix, Dr. Glushakow and the psychologist, Mr. Laconi, came to plaintiff's door to explain that the defendants were preparing to forcefeed plaintiff very shortly. These individuals further explained that this could be prevented, if I agreed to accept the breakfast tray. At this time, I replied and said ... 'yes, give

- 62 -

me the breakfast tray and I will consume it. I then told these two individuals that they both witnessed me say 'yes, I'll accept the breakfast tray, and consume it. These two gentlemen then stated that they would go relay my message, and confirm that I was willing to eat. I then asked who they would be reporting to?
Dr. Glushakow, then replied... I'm going directly to Ms. Jeanne, Dr. Wiener, Joe Terra, Deputy Sipple, Deputy Sorber, Tammy Ferguson and Captain Etta Williams.
Dr. Glushakow and Mr. Laconi, then stated they would document the same, as well.

113. Plaintiff's breakfast tray and (2) two cartons of milk were placed on a table, that was located directly in front of plaintiff's cell.

114. As plaintiff was waiting to

- 63 -

receive his breakfast tray, the
following defendants suddenly
walked up to plaintiff's cell:
defendant, Lt. Fetter, and
(5) five unknown Cert Team
members. The Cert Team
members all wore masks and
helmets, to conceal their identity.
At this time, Lt. Fetter, was
directing the Cert Team members.
Lt. Fetter, shouted "open the
door and get him"! Before the
door opened, I said ... "My
food is sitting right there, give
me the food, so I can eat it."
Lt. Fetter, ignored me and again
shouted for someone to open the
door. At this time, plaintiff
was laying on the floor directly
in front of the door, and at
no time did plaintiff ever resist.
As soon as the door was opened
the five Cert Team members
rushed into the cell and jumped
directly on top of plaintiff.

-64-

Lt Fetter, then directed these officers to handcuff and shackle plaintiff. A video camera was present to record this *entire* incident — the cell extraction, assault and use of force and forcefeeding unnecessarily. Once plaintiff was handcuffed and shackled, Lt. Fetter, then directed the officers to place plaintiff into the restraint chair. At this time, plaintiff explained that he cannot get into a restraint chair, due to his spinal cord injuries. Plaintiff explained that he was already in pain, and they would only make it worse. Plaintiff then said, I'm not fighting or resisting, so why is *force* being used? The video will clearly show that plaintiff is cooperating, complying with *all* orders and never once offering any resistance. Nevertheless, these defendants

- 65 -

are using force unnecessarily,
by slamming and stuffing plaintiff
into the restraint chair. Plaintiff
is in pain and pleading for them
to stop. These defendants are
deliberately causing injury/pain.
Another example of the unnecessary
and wanton infliction of pain,
is evinced by the fact that
once plaintiff was securely
in the chair, the Cert Team
member wielding the taser
device, starts to use the
taser device to shock plaintiff.
This officer had no justification
for shocking plaintiff. Plaintiff
was being tortured with a taser
over and over. The video clearly
shows that plaintiff is NOT
resisting! Plaintiff is screaming
from pain. Plaintiff can be
heard screaming ... stop shocking me!!.
Plaintiff then asks ... Why do you
keep shocking me !? Plaintiff
recognizes the voice of the

- 66 -

individual torturing plaintiff
with the taser. Plaintiff believes
this person to be identified
as Sgt. Rivera, based on his
voice. Plaintiff also sued
this defendant, in the past, for
his retaliatory abuse toward
plaintiff. Lt. Fetter, stood by
idly and permitted Sgt. Rivera
to taser plaintiff again and again.

115. After being assaulted and
forced into a restraint chair, plaintiff
was wheeled to an unknown location
inside of SCI-Phoenix; where
several defendants were waiting to
force feed plaintiff. Plaintiff identifies
the following defendants that
participated in the forcefeeding:
Dr. Wiener, Jeanne Welsh, Nurse Mark,
(2) two Jane Doe nurses - described
as (1) female African American Nurse
and (1) female, believed to be Hispanic,
Lt. Fetter and (5) Cert Team Members.

- 67 -

116. After being wheeled to the room, (where force feeding occurred), the defendants utilized a scale to weigh plaintiff — while plaintiff remained strapped into the restraint chair. Plaintiff then sees Dr. Wiener, and requests to be taken out of restraint chair — due to excruciating pain and injuries. Plaintiff pleads and explains that he was willing to eat, and Dr. Glushakow and Mr. Laconi, are witnesses that plaintiff was willing to eat. In response, Dr. Wiener denied my request to be removed from restraint chair. Dr. Wiener explained ... "they want you to remain in the restraint chair." Dr. Wiener, is referring to the security officers and staff involved in force feeding — including Jeanne Welsh. Plaintiff again explained he would eat and the restraint chair was unnecessary. However, the defendants again denied plaintiff's requests to be removed from restraint chair.

117. Dr. Wiener again asked plaintiff if he was now prepared to eat? Plaintiff again said <u>yes</u>, give me the food. Nurse Mark, then appeared with a huge plate of food, which contained Chicken, Rice, Beans and (2) two oranges and (3) cups of water. Dr. Wiener, then stated that plaintiff must consume <u>one-quarter</u> of the plate. The video will show plaintiff eating the food. Plaintiff ate <u>more</u> than one-quarter. Plaintiff ate approximately one-half of the plate. Nurse Mark, then pealed two oranges which plaintiff consumed both oranges. After plaintiff finished eating, plaintiff again requested to be taken out of chair. The plaintiff's lied and tricked plaintiff. Despite plaintiff consuming the food, the defendants refused to take plaintiff out of chair. Nurse Mark, tipped the remaining portion of food onto the floor. The defendants then told Nurse Mark

– 69 –

to retrieve another plate of food.
Nurse Mark, returned with another
plate - (identical to the first plate
including portion amounts).
Dr. Wiener then stated that they,
(the deputies), wants plaintiff to
eat another quarter of food.
Plaintiff again finished approximately
one-half of the plate. Despite
plaintiff eating more than one-half
of the required amount of food,
the defendants still weren't done
torturing plaintiff.

118.   Dr. Weiner, returned to
plaintiff, and said they still want
me to forcefeed you. Plaintiff
then told Dr. Wiener, that what
he and the defendants are doing
amounts to torture and cruel
and unusual punishment, - especially,
since plaintiff just finished eating
all the food and two oranges.
Plaintiff again mention the illegal
violations — including the Hippocratic

- 70 -

oath, to do no harm! Plaintiff
again reminded Dr. Wiener, not to
go along with and permit the
defendants to torture him again.
Plaintiff then explained the torturous
pain, and how the defendants will
deliberately force voluminous amounts
of fluids directly into plaintiff's
lungs.
The defendants intentionally force
fluids into plaintiff's lungs in order
to cause suffocation and choking.
By forcing fluids into plaintiff's lungs
the defendants are essentially drowning
plaintiff. Despite the choking, gagging,
vomiting, suffocation and drowning,
the defendants continue the botched
procedure and also smile and laugh.
The defendants make clear that they
torture plaintiff in this manner
in order to teach plaintiff a lesson,
See and review all relevant forcefeeding
videos of plaintiff.
The defendants also hide their true
intentions behind the court's order

- 71 -

by falsely claiming that ..., "we are only following the courts order," as if the court is directing the defendants to proceed in this manner. However, the Courts never intended for its order/injunction to be abuse, misused, or utilized as legal means to <u>torture</u> an individual.

119. The defendants do <u>not</u> require those individuals involved in administering the force feeding to be properly trained. In fact, many nurses that performed this dangerous procedure on plaintiff - <u>did so for the first time</u>!

120. Force feeding is a very <u>dangerous</u> procedure, which could result in death. Force feeding should <u>only</u> be utilized to <u>preserve life</u>, and <u>not</u> to <u>torture</u> an individual, simply because you loathe him and desire to "teach him a lesson"

– 72 –

121. The Courts frown upon granting injunctions to force feed individuals; especially the intrusive and overly broad ones — such as the instant matter. Although, the defendants cited and misapplied the _Kallinger_ case – which is a 1990 case. However, in _Hill V. Dept. of Corrections_, which is a more recent case from 2010. (Cited as 992 A.2d 933 (2010). The _Hill_ case and decision regards the PA. Dept. of Corrections seeking an overly broad injunction to force feed Hill. The Court held that the injunction permitting the D.O.C to involuntarily administer _nutrition_ and hydration, was overly broad.

Like here, (just as in the Hill case), the Dept. of Corrections, _NEVER_ presented evidence to the Court that plaintiff's life was in imminent danger, absent forced nutrition.

The Montgomery County Court of Common Pleas _erred_ in issuing a _permanent_ injunction authorizing the defendants to force feed

- 73 -

plaintiff, whenever they decide to, (since
the department wasn't required to present
sufficient evidence to support.
As long as the permanent injunction remains
in place, nothing prevents the defendants
from torturing plaintiff in the future, or
even causing plaintiff's death, by intentionally
botching the procedure, and forcing fluid
into plaintiff's lungs, until he drowns.

122. In the Hill, decision, Hon. Judge
McCullough, issued a concurring
opinion, in order to address his concerns.
In doing so, Judge McCullough, explains...
"[F]orce feeding an inmate is a grave
matter that raises substantial legal, ethical
and medical questions". Hon. McCullough,
then explains the method and procedure
utilized to force feed someone. Several examples
demonstrate how the procedure is often performed
in an inhumane manner, causing pain and
harm to the prisoner.
In the instant matter, the defendants absolutely
tortured plaintiff, by force feeding plaintiff, on
more than one occasion. The defendants

- 74 -

are utilizing the nasogastric tube to torture and cause excruciating pain and injury. For example, the <u>video</u> of plaintiff's forcefeeding on 6-13-19, will show the two Jane Doe defendants <u>forcing</u> the <u>nasogastric</u> tube up plaintiff's nose. At one point she starts <u>shoving</u> and after her attempts were unsuccessful, she explained to Dr. Wiener that... '<u>the tube is too big</u>, <u>it doesn't fit</u>." Instead of using <u>smaller</u> tubing, Dr. Wiener, instructed her to try the other nostril, make <u>it fit</u>, which she eventually did, but <u>NOT</u> before causing plaintiff to suffer extreme pain/injury to both nostrils/nasal passages and throat, as well as lungs. The defendants could clearly see plaintiff struggling to breathe, however, the defendents refused to stop. Plaintiff, also choked and vomited - including blood. Upon completion, the defendants refused to provide medical treatment to plaintiff, and simply tossed plaintiff back onto the floor of his cell.

123. All of plaintiff's painful injuries could and should've been <u>avoided</u>. The fact remains that plaintiff <u>Never</u> needed to be force fed! Further

~ 75 ~

proof of the retaliatory motive/intent of the defendants, is the fact that even AFTER plaintiff ate all of the food, they still wanted to forcefeed plaintiff.

The video will also demonstrate that plaintiff requested and was more than willing to drink all of the liquids/fluids, that the defendants had stored in syringes, prior to actual forcefeeding - see video! Plaintiff states,- I can just drink that! Please let me drink it, instead of forcefeeding me.

Dr. Wiener said... No, they would rather I forcefeed it to you instead.

The defendants actions amount to torture and retaliatory abuse.

124. On 8-4-19, the following defendants retaliated against plaintiff, by cutting all of plaintiff's clothes off of him, sexually harassing plaintiff, invading plaintiffs privacy and then leaving plaintiff naked and unable to dress himself, - plaintiff had to wait until the next day to be dressed again,- Defendant, Lt. Davis, Sgt. Moyer, Co' Anderson, Co' Johnson, Co' Belador, and Sgt. Fondi.

– 76 –

On this same day, and approximately (30) thirty minutes prior to this incident Sgt. Fondi, had plaintiff stripped searched. Defendant Fondi, also told the above named plaintiff's to "grind plaintiff up", and also to make sure plaintiff is placed on the floor. After the second strip-search was conducted, defendant co' MS. Johnson, later returned to plaintiff's cell, and threatened to make plaintiff's life a "living hell, if he reported/grieved the incident, Plaintiff immediately requested a grievance, and this defendant ignored plaintiff and walked away w/o ever providing the grievance. Plaintiff later filed a P.R.E.A. complaint against these officers, for harassment, retaliation, sexual harassment and abuse.

## EXHAUSTION AND ADMINISTRATIVE REMEDIES

125. The plaintiff has exhausted his administrative remedies for all claims/defendants.

- 77 -

## CAUSES OF ACTION / CLAIMS FOR RELIEF

126. The actions of all defendants in using physical force against plaintiff, without need or provocation, or in failing to intervene to prevent the misuse of force and/or excessive force, were done maliciously and sadistically and constituted cruel and unusual punishment in violation of the Eigth Amendment of the U.S. Constitution.

127. The actions of all defendants in using physical force against the plaintiff without need or provocation constituted the tort of assault and battery under the law of Pennsylvania.

128. The failures of defendants, John Wetzel, Tammy Ferguson, Joe Terra, T. Fauber, chase Defelie, Mn Wright, Dr. Wiener, JEANNE Welsh, Ms. Savage, Deputy Sipple, Lt. Fetter, Lt. Ridgely, Lt. Davis, Deputy Sipple, Capt. Williams, Mrs. Owens, and Keri Moore, to take disciplinary or other action to curb the known pattern of physical abuse toward

- 78-

plaintiff, and other prisoners, by all of
the remaining defendants constituted
deliberate indifference to the plaintiff,
and other prisoners, safety, and
contributed to and proximately caused
the above-described violation of
Eigth Amendment rights and
assault and battery, on more than
one occasion.

129. The actions of Wetzel, Ferguson,
Terra, Sipple, Sorber, Fauber and Owens,
in refusing to call the witnesses requested
by the plaintiff, finding him guilty of
Assault with no evidence to support the
charge, and providing an inadequate
written deposition of the charges, and
of Ferguson, Sipple, Sorber, Terra
and Fauber, in upholding the
disciplinary decision, denied the
plaintiff due process of law
in violation of the Fourteenth
Amendment to the U.S. Constitution.

130. The failure of defendants: Wetzel,

- 79 -

Ferguson, Dr. Sarah, Mrs. Savage,
Dr. Wiener, Deputy Sipple, Deputy Terra,
Deputy Sorber, Jeanne Welsh, Mr.
Walsh-(Physician's Asst), Keri Moore,
Mrs. Owens, to provide the necessary
surgery to correct the injuries
to plaintiff's spine, back and legs,
lungs, throat/thyroid, follow up
examination and treatment on
spine, back, legs, lungs, throat/thyroid
nose/nasal passage, and physical
therapy for plaintiff's injuries,
constitutes deliberate indifference
to the plaintiff's serious medical
needs in violation of the Eighth
Amendment to the U.S. Constitution.

131. The failure of the above named
defendants to provide surgery for
plaintiff's spine, back, legs, lungs,
throat/thyroid, nose/nasal passage,
and follow examinations and
physical therapy for his injuries,
constitutes the tort of negligence
under the law of Pennsylvania.

132. All of the defendants' actions, as well as their policy/practice of keeping plaintiff permanently isolated in solitary confinement has deprived and continues to deprive plaintiff his basic human needs,— including, but not limited to showers, yard, exercise, fresh air, sunlight, family visits, programs and activities, access to the law library, subjecting plaintiff to a substantial risk of harm. The practices violates plaintiff's human dignity and his constitutional right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments of the U.S. Constitution. Specifically, Defendants' policies and practices are cruel and unusual because they deprive plaintiff of basic human needs, and continue to threaten and cause serious and irreparable psychological and physical injury, and violate minimal standards of human dignity. Plaintiff has been permanently isolated for over

- 81 -

(10) ten consecutive years. The defendants made it clear to defendant that they have no intention of releasing plaintiff from such isolation, or permitting the plaintiff to even participate in out-of-cell programs and activities.

133. Plaintiff also seeks Declaratory Judgment and Injunctive Relief for Violations of Eighth and Fourteenth Amendments, (Cruel and Unusual Punishment) Against all defendants in their Official Capacities and Individual Capacities, as well.
        Deprivation of Basic Human Needs

134. The physical and psychological consequences of long term isolation constitute a serious deprivation of fundamental human needs, including but not limited to human interaction, environmental stimulation, sleep and adequate physical exercise.
The following defendants, Wetzel, Ferguson, Terra, Sipple, Sorber, Mr. Wright,

- 82 -

Mr. Fauber, Lt. Davis, Sgt. Moyer, Sgt. Fondi,
CO' Ms. JOHNSON, CO' Smothers,
CO' Policki, CO' Belador, Jeanne Welsh,
Ms. Savage, CO' Ellerbee, Mr. Walsh,
Keri Moore and Mrs. Owens, have all
been active participants in ensuring
that plaintiff remains locked and
isolated in his cell, 24-hours
a day, for seven days a week.
The above named officers, specifically,
from the 2-10 pm shift will often
run and slam plaintiff's door closed,
whenever, the cells are open for
recreation in the dayroom.
These defendants have also instructed
plaintiff not to request to
participate or even ask to come
out of his cell because he will
not be permitted. Although,
plaintiff requests to participate
every single day, these officers
deny plaintiff's request, then
slam plaintiff's door close, and
fabricate the paperwork stating
plaintiff has "REFUSED" to participate,

- 83 -

## Serious Psychological/Physical Injury

135. This extensive deprivation of basic human needs causes intense psychological anguish and is likely to result in lasting psychological and physical injury to plaintiff.

136. The permanent and undetermined length of solitary confinement in such extremely harsh conditions of isolation, which plaintiff has been subjected to for over (10) ten years, also poses significant risk of incapacitation and permanent mental illness and physical harm.

## Deprivation of Human Dignity in Violation Of Contemporary Standards of Human Decency and Disproportionate Punishment.

137. The Defendants' policy of placing plaintiff in permanent isolation and solitary confinement, inflicts

– 84 –

disproportionate punishment on plaintiff. The defendants continue to keep plaintiff isolated in these cruel conditions simply because they hate plaintiff and desire to retaliate and punish/torture plaintiff, serves no <u>valid</u> or lawful purpose. In addition, this policy/practice toward plaintiff has no <u>legitimate</u> rationale and <u>does</u> <u>not</u> serve any security needs.

The defendants have inflicted over (10) ten <u>cruelly harsh years</u> of mental and physical harm on plaintiff. Plaintiff has been stripped of his dignity and worth. Such action by the defendants transgresses any civilized society's notions of decency, and constitutes a practice that is disavowed in modern society. The international community has universally condemned such extended isolation in solitary confinement.

## The Defendants' Deliberate Indifference
## TO THE DEPRIVATIONS Suffered By Plaintiff

138. The ongoing policy and practices that have been implemented for Plaintiff, with deliberate indifference to the substantial risk of serious harm the policies/practices have created.
The literature on prolonged and indefinite solitary confinement is extensive and unanimous in its conclusions on the harms of solitary confinement/isolation. Plaintiff has put the defendants on notice, and continues to do so, with regards to all of the deprivations stated above. However, plaintiff has been ignored, and the defendants continue to implement the solitary confinement policies described herein.

139. The mental anguish and extreme suffering arising out of the conditions in which plaintiff

remains permanently isolated and confined in, and the long-term effects of these conditions, are known to defendants.

Plaintiff has frequently made the defendants aware, through his filing of administrative grievances and written complaints, to explain plaintiff's present and ongoing suffering, and the substantial injuries plaintiff has sustained as well. The conditions of plaintiff's permanent isolation has had a damaging & negative impact, and which continues to deteriorate. Plaintiff has specifically requested the defendants to help him, by taking reasonable alternatives that would mitigate the torturous suffering that plaintiff is being forced to endure. However, the defendants have taken no remedial action, and instead have elected to maintain plaintiff's current conditions.

- 87 -

& Proximate

140. As a direct result of Defendants' constitutional violations described above, plaintiff has suffered serious harm, and is at substantial risk of harm in the future. Plaintiff has no adequate remedy at law for defendants' actions. Plaintiff will continue to suffer irreparable harm, unless the defendants are enjoined from continuing their unlawful policies, practices and/or customs, which have directly and proximately caused the constitutional violations.

141. Additionally, an actual controversy exists regarding the constitutionality of the defendants' practices and policies regarding plaintiffs permanent isolation in solitary confinement. A declaration on this issue will resolve that portion of the controversy between the parties, and the Court's

— 88 —

determination of the issues will
guide Defendants' actions.

Declaratory Judgment and Injunction
Relief for violations of the
Fourteenth Amendment (Due Process)
Against all defendants In their
Official and Individual Capacities

142. By denying plaintiff any review
whatsoever if his prolonged placement
in solitary confinement and permanent
isolation, and providing no possibility
of removal from complete isolation
The defendants are depriving plaintiff
of liberty without due process of law
in violation of the Fourteenth Amendment
to the United States Constitution.

143. The conditions and the length of
confinement to which plaintiff is being
subjected to, constitutes an atypical
and significant hardship as compared
with the ordinary incidents of prison
life for three reasons: (1) the complete

— 89 —

isolation; (2) the indefinite and permanent nature of plaintiff's confinement; and (3) plaintiff's inability to challenge the permanent isolation in solitary confinement.

## Plaintiff's Conditions

144. Plaintiff's condition at SCI-Phoenix are unjustifiably severe. Plaintiff is permanently confined to a bed and forced to live in isolation for 24-hours a day, for (7) seven days a week. The defendants never allow plaintiff to exit his cell, unless he receives a legal visit, or attends a legal proceeding or medical appointment. Plaintiff isn't permitted to shower, go outside/dayroom or attend programs — such as church. Plaintiff is not permitted to watch the television in the dayroom either.

Plaintiff has zero ability to attend the exercise yard. Plaintiff has very little meaningful human interaction and mental stimulation. Whenever, prisoners attempt to talk to plaintiff to engage and interact, the officers often chase them away from plaintiff's door and/or give them direct orders to stay away from plaintiff.

## Duration of Confinement

145. Plaintiff has been held in these devastating conditions and extreme isolation for over (10 ½) ten years and six months. Plaintiff has been incarcerated for a total of (18) eighteen years; in which (16) sixteen of those total years has been in solitary confinement.

## Lack of Any Process

146. The defendants haven't provided plaintiff with any notice of what he can do to be removed from solitary confinement, or to determine why plaintiff requires complete / total isolation.

147. The defendants violate the due process rights of plaintiff, by forcing plaintiff to live in conditions that impose atypical and significant hardships, without procedural protections.

148. As a direct and proximate result of Defendants' constitutional violations described above, plaintiff has suffered serious harm, and remains at substantial risk of serious harm in the future. Plaintiff has no remedy at law for defendants' actions. Plaintiff will continue to suffer irreparable harm to his constitutional rights unless defendants

-92-

are enjoined from continuing their
unlawful policies, practices and/or
customs, which have directly and
proximately caused these constitutional
violations.

149. Additionally, an actual controversy
exists regarding the constitutionality
of defendants' practices and policies
regarding the permanent placement
and isolation in solitary confinement.
A declaration on this issue will
resolve that portion of the
controversy between the parties,
and the Court's determination
of the issue will guide Defendants'
action.

## First Amendment Violations

150. Plaintiff incorporates paragraphs
1 through 149 of this complaint
herein by reference as if set
forth in full.

151. The defendants violated plaintiff's First Amendment rights, by attacking, torturing and abusing plaintiff, as described of in this complaint, and also did so in retaliation for the inmate grievances that plaintiff filed against the defendants, also including the medical defendants, in violation of plaintiff's rights guaranteed under the first Amendment to the U.S. Constitution.

152. Plaintiff had, and continues to have, a U.S. Federally protected First Amendment Constitutional Right, to file inmate grievances and seek redress.

153. The defendants also violated plaintiff's First Amendment right by denying plaintiff his pain and nerve damage medications, The medical defendants retaliated

- 94 -

against plaintiff, because plaintiff filed grievances against these defendants.

154. As a result of the retaliatory denial of plaintiff's pain medication, plaintiff suffered the adverse action of extremely serious and torturous pain, in addition to the actions of the defendants: Dr. Wiener and his medical staff, Jeanne Welsh, Dr. Sarah, Mr. Walsh (Physician's Asst.), Nurse Dennis, Nurse Paul, Nurse Joey, Mrs. Savage, and (2) Jane Doe nurses, from 6-13-19, forcefeeding — denying medical care & treatment (injuries sustained). The Defendants' demonstrated adverse action sufficient to deter a reasonable person from exercising his Constitutional Rights.

ADA VIOLATIONS, DISCRIMINATION AGAINST PLAINTIFF'S DISABILITY, EQUAL PROTECTION

-95-

155. PLAINTIFF WAS DENIED EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT.

156. The defendants discriminated against plaintiff's disability, by denying plaintiff reasonable accommodations under the ADA- American's with Disabilities Act.

157. Plaintiff incorporates paragraphs 1 through 156, as though they were stated fully herein.

158. Plaintiff is handicapped and permanently confined to his bed, due to the significant injuries the defendants caused to plaintiff's spine, leg/back, which prevents plaintiff from walking, or utilizing a wheelchair.

159. Plaintiff utilizes a gurney whenever he is transported anywhere. Plaintiff has been utilizing his gurney for (10) ten years.

- 96-

160. The defendant acknowledges that plaintiff is handicapped, and plaintiff resides in a handicapped cell.

161. The defendants accommodate plaintiff's handicap, via gurney transports and a food cart with wheels, for plaintiff to retrieve his food.

162. The defendants selectively utilizes plaintiff's gurney accommodations, by picking and choosing when to provide the accommodations. For example, the defendants will provide plaintiff's gurney for transports to all legal visits or legal proceedings, but will not provide the gurney for plaintiff's family visits. The defendants also refuse to accommodate plaintiff with his gurney transports to the shower, or yard or any other program or activity that plaintiff qualifies for.

- 97 -

163. Although, plaintiff _cannot_ utilize a wheelchair, nor has plaintiff ever utilized a wheelchair. Nevertheless, the defendants demand that plaintiff use a wheelchair.

164. The defendants' actions amount to discrimination and violates the ADA, Fourteenth Amendment to the U.S. Constitution

165. Plaintiff has right to 'Equal protection' of the laws. As a handicapped person, plaintiff is similarly situated to other handicapped individuals, and should be treated alike. The defendants accommodate other disabled persons — e.g., with walkers, canes, wheelchairs, etc. However, they discriminate against plaintiff's disability and accommodation. The defendants have no _rational basis_ to treat plaintiff differently, but only does so in order to retaliate and keep plaintiff permanently isolated. The defendants' action violates _ADA_ and U.S. Constitution.

# FOURTH Amendment Violation
## Invasion of Plaintiff's Privacy

Plaintiff incorporates paragraphs 1-165, as stated fully herein.

166. The following defendants: Supt. Ferguson, J. Terra, Deputy Sipple, Deputy Sorber, CO' Ellerbee, Capt. Williams, Lt. Fetter, Nurse Dennis, Nurse Paul, Lt. Ridgely, (5) members Cert team from 5-7-19, CO' Policki, CO' Belador, CO' Armstrong, CO' Smothers, CO' Mrs. Johnson, Sgt. Moyer, Lt. Davis and Sgt. Fondi, violated the Fourth Amendment Right of plaintiff, by invading plaintiff's body with the unreasonable strip search and was devoid of penological interests.

167. Plaintiff retains a legitimate expectation of privacy of his body. The manner in which the strip search was conducted was overly intrusive and unnecessary invasion of plaintiff's personal rights. It was unreasonable for the defendants to cut all of plaintiff's clothes off and leave plaintiff stripped bare/naked until the following afternoon, which violated the Fourth Amendment to the U.S. Constituti

-99-

## Relief Requested

**WHEREFORE**, plaintiff requests that the court grant the following relief:

A. Issue a declaratory judgment stating that:

1. The physical abuse of the plaintiff by the defendants violated plaintiff's rights under the Eighth Amendment to the U.S. Constitution, and also constituted an assault and battery under Pennsylvania state law.

2. The defendants' failure to take action to curb the physical abuse of plaintiff/prisoners violated the plaintiff's rights under the Eighth Amendment to the U.S. Constitution and constituted an assault and battery under Pennsylvania state law.

3. The Defendants' actions in conducting plaintiff's disciplinary hearing(s), and the defendants' actions in sustaining it, violated the plaintiff's rights under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

4. The Defendants actions in failing to provide adequate medical care for the plaintiff violated, and continues to violate,

- 100 -

the plaintiff's rights under the Eighth
Amendment to the U. S. Constitution.

B. Issue an Injunction ordering the
Defendants, or their agents to :
   1. Immediately arrange for plaintiff's
corrective surgery — (Micro Disechtomy
and/or Anterior Lumbar Interbody Fusion),
on plaintiff's spinal cord, by a qualified
surgeon/specialist.
   2. Immediately arrange for the plaintiff's
need for physical therapy, or other follow-up
medical treatment to be examined and
evaluated by a medical practitioner with
expertise in the treatment and restoration
and function of spinal cord injuries; and
for plaintiff's other injuries — (e.g., legs,
lungs, nose/nasal passage, throat/thyroid).
   3. Carry out without delay the treatment
directed by such medical practitioner.

C. Issue an Injunction ordering defendants to:
   1. Release the plaintiff from the punitive
isolation and segregation and provide him
with same rights and privileges of general
population

– 101 –

2. Expunge the disciplinary convictions described in this complaint from the plaintiff's institutional record.

D. Granting Permanent Injunctive Relief Enjoining Defendants and their predecessors, successors, present or former agents, representatives, those acting in privity and concert with them, or on their behalf, from :

1. Involuntarily examining and performing invasive diagnostic tests, including blood and urine tests, on plaintiff and administering medical treatment, including nutrition, hydration and medication.

E. Granting Permanent Injunctive relief Requiring Defendants to Present a Plan to the Court within 30 days that provides for :

1. The promulgation of a meaningful housing placement for plaintiff, which would grant plaintiff immediate access

-102-

to participate in and enjoy the benefits, opportunities and have the same privileges as general population.

F. Award compensatory damages in the following amounts:

1. $1,000,000 $\frac{00}{}$ jointly and severally against the defendants for the physical and emotional torture, and injuries sustained as a result of plaintiff's abuse, unnecessary force-feeding and being tortured with a taser.

2. $1,000,000 $\frac{00}{}$ jointly and severally against the defendants for the punishment, including deprivation of liberty and amenity, and emotional injury resulting from their denial of due process in connection with the plaintiff's disciplinary proceeding.

3. $1,000,000 $\frac{00}{}$ jointly and severally against the defendants for the physical and emotional injury resulting from their failure to provide adequate medical care to the plaintiff.

G. Award punitive damages in the following amounts :

1. $100,000 00 each against the defendants.
2. $100,000 00 each against those defendants that participated in the unnecessary force feeding and torturous abuse.
3. $100,000 00 each against each Cert Team Member that used excessive force on plaintiff, while he was in shackles and handcuffs, and offering no resistance/provocation.

H. Award compensatory damages jointly and severally against

1. $5,000,000 00 each against the defendants for the punishment and emotional injury resulting from their denial of due process in connection with the plaintiff's disciplinary proceedings. By this demand, plaintiff seeks compensatory damages for the loss

of privileges and quality of life in his prison living conditions, and loss of the limited liberty enjoyed by prisoners, resulting from his segregated confinement, in that he was confined 24-hours a day in a cell roughly 60 feet square, and deprived of most of his personal property as well as the ability to work, attend educational and vocational programs, watch television, associate with other prisoners, attend outdoor recreation in a congregate setting with the ability to engage in sports and other congregate recreation activities, attend meals with other prisoners, attend religious services, take showers, attend law library and receive family visits. Plaintiff separately and in addition seeks compensatory damages for the mental or emotional distress resulting from his prolonged confinement in segregation without due process of law, to which he is entitled because of the physical injuries sustained in his torturous abuse and unnecessary forcefee

- 105 -

and being shocked and tortured with a taser, while handcuffed and shackled, and as a result of the deprivation of medical pled herein.

2. $100,000.00 against each medical defendant for the retaliatory denial of plaintiff's pain and nerve damage medication, and violation of plaintiff's rights under the First Amendment.

I. Award plaintiff his costs and reasonable fees.

J. A Jury Trial on all issues triable by jury.

K. Granting such other and further relief as the court deems just and proper.

Dated: 12-26-19

Respectfully submitted,
Samuel B. Randolph, IV.

Samuel Randolph
#FJ-5881
Box 244
Collegeville, Pa.
19426

<u>Certificate of Service</u>

I hereby certify that I served the foregoing Plaintiff's First Amended And Supplemental Complaint, and attached Exhibits A-H, via First Class Mail to the Clerk's Office for U. S. District Court Eastern District.

12-26-19

Samuel B. Randolph, IV, PRO SE

December 26, 2019

Dear Clerk,

Please accept for filing in this matter, the enclosed 'Plaintiff's First Amended & Supplemental Complaint', and Attached Exhibits A-H.

Thank you.

Sincerely,

Samuel B. Randolph, IV, PRO SE

PS- Attached Certificate of Service also

EXHIBITS

A — H

*EXHIBIT A*

# Supreme Court of Pennsylvania
## Court of Common Pleas
## Civil Cover Sheet

**Montgomery** _____ County

| For Prothonotary Use Only: | |
|---|---|
| Docket No: 2019-13891 | *TIME STAMP* |

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**Commencement of Action:**
- ☒ Complaint
- ☐ Writ of Summons
- ☐ Petition
- ☐ Notice of Appeal
- ☐ Transfer from Another Jurisdiction
- ☐ Declaration of Taking

**Lead Plaintiff's Name:** Commonwealth of PA/Dept. of Corrections

**Lead Defendant's Name:** Samuel B. Randolph

☐ **Check here if you are a Self-Represented (Pro Se) Litigant**

**Name of Plaintiff/Appellant's Attorney:** Chase M. Defelice

Are money damages requested? : ☒ Yes ☒ No

Dollar Amount Requested:
(Check one)
- ☒ within arbitration limits
- ☐ outside arbitration limits

Is this a **Class Action Suit?** ☒ Yes ☒ No

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE**. If you are making more than one type of claim, check the one that you consider most important.

**TORT** *(do not include Mass Tort)*
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability *(does not include mass tort)*
- ☐ Slander/Libel/ Defamation
- ☐ Other:

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other:

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional:

**CONTRACT** *(do not include Judgments)*
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other

- ☐ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other

- ☐ Other:

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure
- ☐ Partition
- ☐ Quiet Title

- ☐ Other:

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Zoning Board
- ☐ Statutory Appeal: Other

Judicial Appeals
- ☐ MDJ - Landlord/Tenant
- ☐ MDJ - Money Judgment
- ☐ Other:

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin

- ☒ Other: Civil Action

*Pa.R.C.P. 205.5*

2/2010

2019-13891-0000   5/22/2019 1:49 PM  # 12319889
Rcpt#2019-13-00939  Fee:$290.00  Complaint Civil Action
Main (Public)
MontCo Prothonotary

## IN THE COURT OF COMMON PLEAS OF
## MONTGOMERY COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS,

1200 Mokychic Drive Plaintiff,
Collegeville, PA 19426
     v.

SAMUEL B. RANDOLPH,

1200 Mokychic Drive Defendant.
Collegeville PA
    19426

No. 2009-13891

Civil Action

### NOTICE TO DEFEND

    You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the Court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the Court without further notice for any money claimed in the Complaint or for any other claim or relief requested by the Plaintiff. You may lose money or property or other rights important to you.

    YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND WHERE YOU CAN GET LEGAL HELP.

Montgomery Bar Association
100 A.W. Airy Street
PO Box 268
Norristown, PA 19404
610-279-9660

# IN THE COURT OF COMMON PLEAS OF
## MONTGOMERY COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS,

               Plaintiff,

        v.

SAMUEL B. RANDOLPH,

               Defendant.

:
:
:
:
:
:
:
:
:
:
:

No. 2019-13891

Civil Action

## COMPLAINT

AND NOW, comes the Plaintiff, Commonwealth of Pennsylvania, Department of Corrections, by and through its undersigned counsel and avers the following in support of this Complaint:

1.    This action is brought in the Court's original jurisdiction.

2.    Plaintiff is the Commonwealth of Pennsylvania, Department of Corrections (hereinafter "Department").

3.    Plaintiff is an administrative department of the Commonwealth of Pennsylvania responsible for administering the state correctional system, including the State Correctional Institution at Phoenix ("SCI-Phoenix").

4.    Defendant Samuel B. Randolph, FJ5881, ("Defendant") is a forty-seven (47) year-old inmate who is presently incarcerated at SCI-Phoenix.

5.    Since May 7, 2019, the Defendant has refused to eat his meals. However, he is keeping hydrated.

6.     Since May 14, 2019, the Defendant was placed in observational cell.

7.     As of breakfast on May 22, 2019, the Defendant has missed approximately 44 consecutive meals.

8.     Defendant is refusing physical assessment by medical personnel, including vital signs, and weight at this time.

9.     Defendant's last documented weight was 177.5 on May 31, 2018.

10.    Defendant has not been diagnosed with any mental illness.

11.    Defendant has a history of hyperlipidemia, back pain and hypertension.

12.    For more than ten (10) years the Defendant has claimed that he cannot walk or bend over.

13.    The Department has conducted numerous tests over the years and those tests have not demonstrated that the Defendant is suffering any injury.

14.    The tests did not demonstrate that he has muscle atrophy in his lower extremities.

15.    The fact that the Defendant does not stand or sit impacts the medical department's ability to properly examine the Defendant.

16.    Defendant was evaluated by Dr. Adam Glushakow at SCI-Phoenix on May 20, 2019 and has been deemed mentally competent.

17.    Defendant has previously engaged hunger strikes while housed at SCI-Greene.

18. On or about April 21, 2017, the Department sought an injunction from Greene County after the Defendant missed approximately twenty-five (25) meals and refused medical assessment.

19. The Greene County Court of Common Pleas issued a temporary injunction that expired after approximately six months.

20. Additionally, reviewing the Defendant's recent medical entries he has engaged in hunger strikes that did not result in court intervention, but triggered the Department's hunger-strike protocol on the following dates:

- October of 2017
- June of 2018
- July of 2018
- August of 2018
- November of 2018
- February of 2019

21. It is the opinion of Dr. Stephen Wiener, the Medical Director at SCI-Phoenix that to a reasonable degree of medical certainty Defendant is in imminent danger of the loss of life or other irreparable harm unless he eats.

22. Defendant is further at risk of sudden onset organ failure or death if medical personnel are not permitted to engage in immediate and regular diagnostic testing, including but not limited to, blood and urine tests, as well as the regular and forceful administration of nutrition and hydration. *See* Affidavit of Dr. Stephen Wiener attached hereto as Exhibit "A".

23.   It is impossible to predict the exact point at which Defendant's condition may result in immediate, severe, and irreparable harm; however, it is without question that the Defendant will suffer such harm if he continues to refuse nutrition.

24.   Permitting Defendant to engage in a suicidal act by refusing to eat will cause a significant disruption to the orderly administration of SCI-Phoenix.

25.   The effects of his death or irreparable harm would demoralize the staff and instill the belief in the inmate population that the prison administration caused and permitted Defendant's death or injury.  This will lead to animosity toward the staff and undermine confidence in prison authority.

[SPACE INTENTIONALLY LEFT BLANK]

WHEREFORE, based on the foregoing, the Commonwealth of Pennsylvania, Department of Corrections, respectfully requests this Court enter an Order authorizing the Plaintiff or Plaintiffs' designee, through medical staff, to involuntarily examine Defendant and administer medical treatment to him, including performing invasive diagnostic tests (including blood and urine tests), providing medication, and by supplying nutrition and hydration intravenously or otherwise, as may be deemed necessary by Plaintiff, to preserve Defendant's health and life; and providing such other relief as this Court deems proper.

Respectfully submitted,

Office of General Counsel

By: _____

Chase M. Defelice, Assistant Counsel
Attorney ID No. 209135
Office of General Counsel
Pennsylvania Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050
Phone: (717) 728-7763/Fax: (717) 728-0312
Email: chdefelice@pa.gov

Date: May 22, 2019

IN THE COURT OF COMMON PLEAS OF
MONTGOMERY COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS,                    :

                     Plaintiff,     :

                          :     No. 2019-13891

       v.                                        :

SAMUEL B. RANDOLPH, .                           :

                 Defendant.        :     Civil Action

## VERIFICATION

I, Jeanne Welsh, Corrections Health Care Administrator at the State
Correctional Institution at Phoenix, am authorized to make this verification. I have
reviewed the attached Complaint with respect to the proposed involuntary treatment
of Samuel B. Randolph, FJ5881.

I hereby verify that the allegations contained in the attached Complaint are
true and correct to the best of my knowledge, information and belief. I make this
verification subject to the penalties under 18 Pa. C.S. § 4904 relating to unsworn
falsification to authorities.

                              _Jeanne Welsh CHCA_
                              Jeanne Welsh
                              Corrections Health Care Administrator
                              SCI-Phoenix

Dated: _5/22/2019_

*EXHIBIT B*

**EXHIBIT A**

## IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS,

                Plaintiff,

      v.

SAMUEL B. RANDOLPH,

                Defendant.

:
:
:
:
:
:    No.
:
:
:
:
:
:    Civil Action

## DECLARATION OF STEPHEN WIENER

I, Stephen Wiener, D.O., aver the following:

1.   I am a medical doctor licensed to practice medicine in the Commonwealth of Pennsylvania.  I am currently the Medical Director at the State Correctional Institution at Phoenix ("SCI-Phoenix").

2.   Defendant Samuel B. Randolph's last documented weight was 177.5 pounds on May 31, 2018.

3.   Defendant has not been diagnosed with any mental illness.

4.   Defendant has a history of hyperlipidemia, back pain and hypertension.

5.   Defendant refuses to walk or remain in the seated position.

6.   Defendant lays on his mattress that is positioned on the floor of his current cell.

7.   Since the Defendant remains lying down it limits the medical staff's

ability to properly examine him, especially when he refuses any examination.

8. Defendant was evaluated by Dr. Adam Glushakow at SCI-Phoenix on May 20, 2019 and has been deemed mentally competent.

9. It is my professional medical opinion, to a reasonable degree of medical certainty that Defendant is in imminent danger of the loss of life or other irreparable harm unless he begins to take regular nutrition.

10. He is further at risk of sudden onset organ failure or death if medical personnel are not permitted to engage in immediate and regular diagnostic testing, including but not limited to blood and urine tests.

11. As a result of the Defendant's refusal to take nourishment he risks irreversible malnutrition which would result in organ failure and possibly death.

[SPACE INTENTIONALLY LEFT BLANK]

12.   It is impossible to predict the exact point at which Defendant's

condition may result in immediate, severe, and irreparable harm;

however, it is beyond question that Defendant will suffer severe,

irreparable harm and possible death if he continues to refuse nutrition.

I understand that this statement is made subject to the penalties of 18 Pa. C.S.

§ 4904, relating to unsworn falsification to authorities.

Stephen Wiener, D.O.
Medical Director at SCI-Phoenix

Dated: May 22, 2019

*EXHIBIT - C*

## IN THE COURT OF COMMON PLEAS OF
## MONTGOMERY COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS,

                        Plaintiff,

          v.

SAMUEL B. RANDOLPH,

                       Defendant.

No. 2019-13891

Civil Action

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1.    Plaintiff's Complaint, Declaration and Application for *Ex Parte* Preliminary Injunction in this matter are incorporated by reference as if fully set forth herein.

2.    Defendant will suffer immediate, severe, and irreparable harm possibly resulting in death if necessary, involuntary medical treatment, including nutrition, are not administered.

3.    Based upon the facts set forth in the Complaint and in Plaintiffs' concurrently filed Application for *Ex Parte* Preliminary Injunction, Plaintiff has a clear right to administer ongoing involuntary medical treatment, including nutrition and hydration. *Commonwealth of Pennsylvania, Department of Public Welfare, Farview State Hospital v. Joseph Kallinger*, 580 A.2d 887 (Pa. Cmwlth. 1990).

WHEREFORE, Plaintiff respectfully requests this Court enter a preliminary injunction authorizing the Plaintiff or Plaintiffs' designee, through medical staff, to involuntarily examine Defendant and administer medical treatment to him, including performing invasive diagnostic tests (including blood and urine tests), providing medication, and by supplying nutrition and hydration intravenously or otherwise, as may be deemed necessary by Plaintiff, to preserve Defendant's health and life; and providing such other relief as this Court deems proper.

Respectfully submitted,

Office of General Counsel

By: _____

Chase M. Defelice, Assistant Counsel
Attorney ID No. 209135
Office of General Counsel
Pennsylvania Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050
Phone: (717) 728-7763/Fax: (717) 728-0312
Email: chdefelice@pa.gov

Date: May 22, 2019

**IN THE COURT OF COMMON PLEAS OF
MONTGOMERY COUNTY, PENNSYLVANIA**

COMMONWEALTH OF PENNSYLVANIA      :
DEPARTMENT OF CORRECTIONS,      :
     :
         Plaintiff,      :
     :      No. 2019-13891
        v.      :
     :
SAMUEL B. RANDOLPH,      :
     :
         Defendant.      :      Civil Action

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Plaintiff's Motion for

Preliminary Injunction was served on the person indicated below by hand delivery;

I also certify that the Motion was read and explained to the below-referenced

individual:

Samuel B. Randolph, FJ-5881
SCI-Phoenix
1200 Mokychic Drive
Collegeville, PA 19426

_Jeanne Welsh, HCA_
Jeanne Welsh
Corrections Health Care Administrator
SCI-Phoenix

Dated: 5/22/2019

*EXHIBIT-D*



LEXSEE 580 A2D 887

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF PUBLIC WELFARE,
FARVIEW STATE HOSPITAL, Petitioner, v. Joseph KALLINGER, Respondent**

No. 239 Misc. Dkt. 1990

Commonwealth Court of Pennsylvania

*134 Pa. Commw. 415; 580 A.2d 887; 1990 Pa. Commw. LEXIS 501*

July 18, 1990, Heard
August 14, 1990, Decided

**SUBSEQUENT HISTORY:** [***1] Publication
Ordered September 10, 1990.

**COUNSEL:** Thomas Blazusiak, with him, Howard Ulan, Asst. Counsel, and John A. Kane, Chief Counsel, for petitioner.

Jeffrey J. Wander, Honesdale, for respondent.

David Ferleger, Philadelphia, Guardian Ad Litem, for Joseph Kallinger.

**JUDGES:** Pellegrini, Judge.

**OPINION BY:** PELLEGRINI

**OPINION**

ORIGINAL JURISDICTION

[*416] [**888] The Commonwealth of Pennsylvania, Department of Public Welfare, (Department), Farview State Hospital (Farview), files this Request for Special Emergency Relief asking this Court for a Declaratory Judgment authorizing the involuntary administration of necessary nutrition and medical [*417] treatment in order to preserve the safety, health and life of Joseph Kallinger (Kallinger).

We are called upon to decide a sensitive matter which is without precedent in this Commonwealth. Joseph Kallinger wants to starve himself to death. [1] The Department, who has custody, wants to force him to involuntarily receive food through a nasogastric tube and other medical treatment. We must decide if the Department has such right.

1 Kallinger, a convicted murderer, is currently serving two consecutive life sentences consecutively with a thirty to eighty year sentence in Pennsylvania. He also must serve a life sentence and a forty-two to fifty-two year sentence in New Jersey. He also must serve other sentences which are too numerous to mention. Needless to say, Joseph Kallinger will spend the rest of his natural life behind bars.

[***2] The current dilemma developed after Kallinger was recently readmitted to Farview on May 17, 1990, from the State Correctional Institution at Huntingdon (Huntingdon). [2] On June 22, 1990, he stated, as a result of his vision of Christ in a toilet bowl telling him to join him, that he would refuse to eat or drink, and that he desires to "meet his maker." He has also refused treatment for an abscess on his foot. On June 30, 1990, Kallinger agreed to be transferred to Wayne Memorial Hospital in Wayne County, Pennsylvania, in order to have intravenous fluids, including antibiotics, administered to him. However, he continued in his refusal to accept nutrition and other medical treatment.

2 Kallinger began serving his Pennsylvania sentences at Huntingdon following his convictions in 1976. However, in 1977, he was committed to Farview where he stayed for over ten years, until 1988. Since 1988, he was recommitted once for a short period of time and then returned to Huntingdon. This recent recommittment was his second since returning to Huntingdon. His current recommittment is scheduled to expire on August 17, 1990.

[***3] On July 3, 1990, the Department filed an action for Declaratory Relief in the Court [**889] of Common Pleas of Wayne County, seeking authority to provide necessary treatment, nutrition and hydration to Kallinger. On that day, the trial court entered a preliminary order permitting the Department to do so. However, on July 10, 1990, after holding a hearing on the matter, the trial court dissolved its preliminary order and determined that Kallinger was competent [*418] and could reject nutrition and hydration necessary to preserve his health, safety and life.

134 Pa. Commw. 415, *; 580 A.2d 887, **;
1990 Pa. Commw. LEXIS 501, ***

The Department filed a Petition For Review seeking Special Emergency Relief pursuant to the original jurisdiction of this Court, and seeking review of the trial court's Order pursuant to our appellate jurisdiction. *Sections 761 and 762 of the Judicial Code, 42 Pa.C.S. §§ 761, 762.* [3]

3    By order dated July 13, 1990, this Court directed the Petition For Review shall be regarded as a Complaint In Equity directed to our original jurisdiction, and that the appeal from the trial court's Order shall be dismissed without prejudice.

[***4]    On July 13, 1990, this Court granted the Department's request for a preliminary injunction, ordering that Kallinger may be involuntarily administered medical treatment, nutrition and hydration, pending further adjudication. On July 18, 1990, following a hearing, a second Order was issued continuing the involuntary medication and feeding of Kallinger pending final adjudication of this matter.

The Department offered testimony and evidence that if Kallinger is allowed to starve to death, this would have major negative repercussions on the prison and mental health systems; that Kallinger's death would have adverse effects on other patients, their families and the staff of the mental hospital; and other patients may also "copy-cat" Kallinger's actions.

Kallinger contends that despite such adverse repercussions to the Commonwealth, he should be allowed to die if he so chooses. He argues that his right to privacy overrides any interests of the Commonwealth because the use of a nasogastric tube to feed him is an overly intrusive procedure which could last a number of years.

We note at the outset that Kallinger is committed to Farview, a mental hospital for the criminally insane. He suffers [***5] from a serious mental illness, diagnosed by Mokarram Jafri, M.D., as a Borderline Personality Disorder. (Notes of Testimony (N.T.), July 10, 1990, p. 35; July 18, 1990, pp. 27-29). However, he is competent in the sense that he fully understands his decision and realizes that [*419] death will result if he continues to refuse nutrition and medical treatment. (N.T. July 10, 1990, pp. 36, 70-71).

We also recognize that Kallinger, through this action, may be attempting to manipulate the system in order to stay at Farview rather than return to Huntingdon. His authorization of his attorneys to enter appearances on his behalf -- one to say that he has the right to die, the other to say the state had an obligation to make him stay alive -- is certainly part of that manipulation. Although Kallinger has in the past and is now manipulating the

system in which he finds himself, if the Department is not allowed to involuntarily provide him with nutrition and medical care, we assume that Kallinger will indeed starve himself to death.

While Kallinger is sufficiently competent to make a decision to starve himself to death, this is not a "right to die" case in the usual sense. There has been [***6] much public debate and court activity over whether such a right exists and in what circumstances it exists, and these cases involve decisions made by enfranchised citizens or someone acting on their behalf, that their substantial rights of privacy allows them to make that decision. *See e.g., Cruzan v. Director, Missouri Department of Health, U.S. , 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990).* Kallinger is a convict and any rights that he may have are extremely limited and severely restricted because of the unique nature and requirements of prison custody. *Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); Jones v. North Carolina Prisoners' Union, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); Price v. Johnston, 334 U.S. 266,* [**890] *68 S.Ct. 1049, 92 L.Ed. 1356 (1948).* What this case concerns is whether the Commonwealth's interest in an orderly administration of the prison system is paramount over any residual right of privacy that Kallinger has which would make it an invasion of privacy on the part of [***7] the Commonwealth to force feed him.

The narrow issue then presented to us is whether the Commonwealth has a right to force a competent prisoner within the Commonwealth's penal system to receive involuntary [*420] medical treatment and nutrition and hydration through a nasogastric feeding tube. To decide this issue, a balancing test is employed, balancing the Commonwealth's interests against the prisoner's remaining right to privacy. *Matthews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).*

Kallinger argues that his right to privacy is superior to the interests of the Commonwealth, no matter what effect it may have on the prison system. He argues that as a prisoner, he did not give up his right to starve himself, citing the Supreme Court of Georgia decision in *Zant v. Prevatte, 248 Ga. 832, 286 S.E.2d 715 (1982).* In that case, the Georgia court held that a competent prisoner had a right to starve himself to death.

The court, in ruling that the state does not have the right to force medical treatment and food on a competent prisoner, stated:

A prisoner does not relinquish his constitutional [***8] right to privacy because of his status as a prisoner. The state has no power to monitor this man's physical condition against his will; neither

does it have the right to feed him to prevent his death from starvation if that is his wish .... The state can incarcerate one who has violated the law and, in certain circumstances, even take his life. But it has no right to destroy a person's will by frustrating his attempt to die if necessary to make a point.

*Zant*, 248 Ga. at 833-834, 286 S.E.2d at 716-717.

Kallinger further argues that the procedure for forcing nutrition and hydration into him is overly intrusive. The procedure which the Department has been and wishes to continue using is a nasogastric tube which is inserted through the nose into the stomach. This tube will remain in his body and will have to be frequently removed and replaced. Kallinger correctly points out that there are several risks involved in this procedure, including internal bleeding and possibly even death. (N.T. July 10, 1990, pp. 42-43, 56-57; July 18, 1990, p. 23).

[*421] While admitting that there are risks to Kallinger as a result of his forced feeding, the Commonwealth [***9] argues that its interest in prison security and discipline, the morale of medical and custodial staff, as well as the law of this Commonwealth, far outweigh any right of privacy that Kallinger may have. We agree.

The Commonwealth has an overwhelming interest in maintaining prison security, order and discipline. The Supreme Court has stated that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the detained constitutional rights of . . . convicted prisoners." *Bell v. Wolfish*, 441 U.S. at 546, 99 S.Ct. at 1878. This lack of a reasonable expectation of privacy deprives the convicts of Fourth Amendment rights in their prison cells. *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).

Prison officials are given a wide range of discretion in the promulgation and enforcement of rules to govern the prison community in order to maintain security, order and discipline. *Bell v. Wolfish; Jones v. North Carolina Prisoners' Union; Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). [***10] *U.S. ex rel. Silverman v. Commonwealth of Pennsylvania*, 527 F.Supp. 742 (W.D.Pa.1981), aff'd *Appeal of Silverman*, 707 F.2d 1395 (3rd Cir.1983). Individual freedoms may be curtailed whenever prison officials, in exercise of their informed discretion, reasonably conclude that their exercise possesses the likelihood of disrupting prison order or stability or otherwise interfering [**891] with the legitimate penological objectives of the prison environment. *St. Clair v. Cuyler*, 634 F.2d 109 (3rd Cir.1980), rehearing denied 643 F.2d 103 (3rd Cir.1980); *See also Bell v. Wolfish; Jones v. North Carolina Prisoners Union; Wilson v. Prasse*, 325 F.Supp. 9 (W.D.Pa.1971), aff'd 463 F.2d 109 (3rd Cir.1972).

Other jurisdictions confronted with the same situation have held that compelled nutrition and medical treatment is proper because of the strong state interest in orderly prison [*422] administration outweighs any convict's residual rights. In *Von Holden v. Chapman*, 87 A.D.2d 66, 450 N.Y.S.2d 623 (1982), Mark David Chapman, serving a twenty year [***11] to life term for the murder of former Beatle John Lennon, attempted to starve himself to death while in a mental institution. The Supreme Court of New York, Appellate Division, in allowing involuntary feeding through a nasogastric tube, found that the legitimate interest in prison security and administration clearly included the right to prevent a prisoner's suicide.

In *Commissioner of Correction v. Myers*, 379 Mass. 255, 399 N.E.2d 452 (1979), the Massachusetts Supreme Court allowed forced hemadialysis to a prisoner suffering a kidney condition on the basis of maintaining prison order. The court stated that imprisonment imposed severe limitations on the prisoner's right to privacy and bodily integrity.

In the present case, the uncontradicted testimony shows that if Kallinger would be permitted to die, other patients at Farview would almost certainly copy the same tactic, manipulating the system to get a change of conditions, possibly resulting in their death. (N.T. July 10, 1990, pp. 13-14, 25-26, 49; July 18, 1990, pp. 16-17, 31). Allowing a prisoner to die will cause other patients to become angry and lose faith in the system and make treatment [***12] more difficult; it may even spawn rioting at Farview or from prisoners at Huntingdon or other state institutions. (N.T. July 10, 1990, pp. 13-14, 20, 26; July 18, 1990, pp. 17-20, 36). It is clear that allowing a prisoner to starve to death while in state custody would have an unpredictable negative effect on the security and order within the prison system.

Besides preserving order with the prison system, the Commonwealth has a strong interest in maintaining the health of prisoners in its custody. The obligation of the Commonwealth to provide for the health and safety of the inmates in their custody is derived from two very important interests: the preservation of human life and the prevention of suicide. The preservation of human life is of great interest to the state. *John F. Kennedy Memorial Hospital* [*423] *v. Heston*, 58 N.J. 576, 279 A.2d 670 (1971). In *Commonwealth v. Root*, 191 Pa.Super. 238, 244, 156 A.2d 895, 900 (1959), revd. on other grds. 403

*Pa. 571, 170 A.2d 310 (1961)*, the Pennsylvania Superior Court stated that "[t]he policy of the law is to protect human life, even [***13] the life of a person who wishes to destroy his own."

The Commonwealth has a duty under the Eighth Amendment to protect the health and welfare of those persons in its custody, *Youngberg v. Romeo, 457 U.S. 307; 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976)*, and may be cast in civil damages for its failure to observe such duty, *Simmons v. City of Philadelphia, 728 F.Supp. 352 (E.D.Pa.1990); Lee v. Downs, 641 F.2d 1117 (4th Cir.1981)*. Furthermore, the Commonwealth has a duty to "provid[e] appropriate medical treatment to reduce the danger that an inmate suffering from a serious mental disorder represents to himself or others." *Washington v. Harper, 494 U.S. , , 110 S.Ct. 1028, 1030, 108 L.Ed.2d 178 (1990)*.

The United States Supreme Court in *Washington v. Harper* allowed the forced administration of antipsychotic drugs to a prisoner on the basis that the state's interest in providing appropriate medical treatment outweighed the inmate's liberty interest. [***14] The Supreme Court found that the state has not only an interest, but an "obligation to provide prisoners with medical treatment consistent not only with their own medical interests, but also with the [**892] needs of the institution." *Washington v. Harper, 494 U.S. at , 110 S.Ct. at 1039*.

Other courts have also considered the state's interest in the preservation of human life. In *State ex. rel. White v. Narick, W.Va , 292 S.E.2d 54 (1982)*, the West Virginia Supreme Court of Appeals allowed the force feeding of an inmate who had begun a hunger strike to protest conditions of his prison. The court found that "[a] state must preserve human life, a concern at the very core of civilization .... West Virginia's interest in preserving life is superior to [the prisoner's] personal privacy (severely [*424] modified by his incarceration)." *Narick, W.Va. at , 292 A.2d at 58. See also Commissioner of Correction v. Myers* (forced hemadialysis treatment on prisoner suffering kidney condition based on preservation of life and maintaining prison order); *Superintendent of Belchertown State School v. Saikewicz, 373 Mass. 728, 370 N.E.2d 417 (1977)*. [***15]

The Court in *Narick* criticized the Georgia Supreme Court's decision in *Zant* by stating:

The Georgia court failed to consider compelling reasons for preserving life, not the least being civility. What sense does it make for a state to allow a prisoner to kill himself, urging as its justification his right-of-privacy right to refuse medical treatment for his voluntary debilitation; and yet preserve unto itself the right to kill him, the ultimate violation of his privacy right. We doubt that Georgia would allow him to raise his right of privacy against being put to death, as a defense against the death penalty!

*Narick, W.Va. at , 292 S.E.2d at 57.*

The second related state interest is the Commonwealth's duty to prevent suicide. "American law has always accorded the State the power to prevent, by force if necessary, suicide -- including suicide by refusing to take appropriate measures necessary to preserve one's life." *Cruzan v. Director, Missouri Department of Health, U.S. at , 110 S.Ct. at 2859, 111 L.Ed.2d 224 (1990)*. (Scalia, J. concurring).

Pennsylvania public policy strongly opposes the commission of suicide. *Commonwealth v. [***16] Root.* Pennsylvania law makes it a crime to aid or solicit another person to commit suicide. *Crimes Code, 18 Pa.C.S. § 2505.* A police officer also has the right to use force to prevent a suicide from occurring. *18 Pa.C.S. § 508(d)(1).* By asking the Commonwealth to stand by and watch him die while it has custody and control over him, Kallinger is asking it to aid and abet his suicide.

[*425] The leading case in support of a state's duty to prevent suicide is *Von Holden v. Chapman.* The Supreme Court of New York, Appellate Division, in rejecting Chapman's right to privacy claim, held that "it is self-evident that the right of privacy does not include the right to commit suicide .... To characterize a person's self-destructive acts as entitled to Constitutional protection would be ludicrous." *Von Holden v. Chapman, 87 A.D.2d at 67, 450 N.Y.S.2d at 625.*

Since Kallinger is a patient at Farview, the Commonwealth's interest in maintaining the integrity of the medical and psychiatric professions is also of great importance. Several courts have held that the integrity of the medical profession is an interest which should be balanced against [***17] a person's privacy right to refuse medical treatment or nutrition. *Cruzan; Narick; Saikewicz.*

If Kallinger is allowed to starve himself to death, repercussions would be felt throughout the medical and psychiatric professions. (N.T. July 10, 1990, pp. 19-20, 24-25, 40; July 18, 1990, pp. 16-17). Dr. Jafri, Chief of Psychiatric Services at Farview, stated that Kallinger's death would "have a negative impact upon the staff [in] that we could not carry out a moral and ethical obligation of keeping a patient alive." (N.T. July 10, 1990, p. 41). Jack Wolford, M.D., Psychiatric Director for the

134 Pa. Commw. 415, *; 580 A.2d 887, **;
1990 Pa. Commw. LEXIS 501, ***

Department, testified that "it would be devastating to the staff and the staff morale if they had to allow someone to cease living, virtually by their own hand, while under our care." (N.T. July 18, 1990, p. 10).

[**893] Furthermore, if he is allowed to die, other patients and their families would have serious doubts about whether the psychiatric staff is providing their patients with proper psychiatric treatment and medical care. (N.T. July 18, 1990, pp. 26-27, 40; July 18, 1990, pp. 19, 36). Dr. Jafri testified that his death "will not encourage the confidence of their patients in our ability to [***18] manage and take care their needs, as [well as] the moral confidence of the public." (N.T. July 10, 1990, p. 41). Dr. Wolford stated that the patients [*426] "would lose trust in the system of care." (N.T. July 18, 1990, p. 17).

The Commonwealth of Pennsylvania has an overwhelming interest in the orderly administration of its prison system. The Commonwealth must maintain prison security, order and discipline. It must also fulfill its duty to provide proper medical care to the inmates, thus preserving life and preventing suicide. These vital interests, along with the need to preserve the integrity of the physicians and psychiatrists working within the penal system, clearly outweigh any diminished right to privacy held by Kallinger.

Accordingly, we order that Farview can and must continue to provide appropriate nutrition through a nasogastric tube and appropriate medical care to Joseph Kallinger so long as he continues to refuse nutrition and medical treatment. Kallinger shall remain committed to Farview until such time as the medical and psychiatric staff feel it's appropriate for him to return to a State Correctional Institution.

ORDER

No. 239 Misc. Dkt. 1990

AND NOW, this [***19] 14th day of August, 1990, it is ordered that the Commonwealth of Pennsylvania, Department of Public Welfare, Farview State Hospital, must provide appropriate nutrition through a nasogastric tube and appropriate medical care to Joseph Kallinger as long as he continues to refuse either. Joseph Kallinger's commitment to Farview State Hospital is extended indefinitely until such time that the medical and psychiatric staff determines that such feeding can be carried out at an appropriate State Correctional Institution.

ORDER

AND NOW, this 10th day of September, 1990, it is ordered that the opinion filed August 14, 1990 shall be [*427] designated OPINION rather than MEMORANDUM OPINION and that it shall be *reported*.

*EXHIBIT - B*

# IN THE COURT OF COMMON PLEAS OF
# MONTGOMERY COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS,                    :

           Plaintiff,                         :

                        :  No. *2019 - 13891*

        v.                              :

SAMUEL B. RANDOLPH,                           :

           Defendant.                        :  Civil Action

## APPLICATION FOR *EX PARTE* PRELIMINARY INJUNCTION

Pursuant to Pa. R.C.P. 1531, the Commonwealth of Pennsylvania, Department of Corrections, petitions this Honorable Court to issue an order *ex parte* granting the concurrently filed Motion for a Preliminary Injunction pending a hearing because of the following:

1.    Plaintiff's Complaint and Motion for Preliminary Injunction in this matter are incorporated by reference as if fully set forth herein.

2.    Defendant will suffer irreparable harm, possibly resulting in death, if the relief sought is not immediately granted.

3.    Immediate relief, as requested, is necessary to sustain the life and health of the Defendant pending the adjudication of this matter.

WHEREFORE, Plaintiff requests this Court to *ex parte* order a preliminary injunction authorizing the Plaintiff or Plaintiffs' designee, through medical staff, to involuntarily examine Defendant and administer medical treatment to him, including performing invasive diagnostic tests (including blood and urine tests), providing medication, and by supplying nutrition and hydration intravenously or otherwise, as may be deemed necessary by Plaintiff, to preserve Defendant's health and life; and providing such other relief as this Court deems proper.

Respectfully submitted,

Office of General Counsel

By: _____

Chase M. Defelice, Assistant Counsel
Attorney ID No. 209135
Office of General Counsel
Pennsylvania Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA  17050
Phone: (717) 728-7763/Fax: (717) 728-0312
Email: chdefelice@pa.gov

Date: May 22, 2019

### IN THE COURT OF COMMON PLEAS OF
### MONTGOMERY COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS,

                Plaintiff,

          v.

SAMUEL B. RANDOLPH,

                Defendant.

:
:
:
:
:
:
:
:
:
:

No. 2019-13891

Civil Action

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Plaintiff's Application for *Ex Parte* Preliminary Injunction was served on the person indicated below by hand delivery; I also certify that the Motion was read and explained to the below-referenced individual:

Samuel B. Randoplh, FJ-5881
SCI-Phoenix
1200 Mokychic Drive
Collegeville, PA 19426

Jeanne Welsh
Corrections Health Care Administrator
SCI-Phoenix

Dated: May 22, 2019

*EXHIBIT - F*

# THE COURT OF COMMON PLEAS OF
# MONTOGOMERY COUNTY, PENNSYLVANIA

COMMONWEALTH OF　　　　　　　　:
PENNSYLVANIA,　　　　　　　　　　:
DEPARTMENT OF CORRECTIONS,　　:
　　　　　　　　　　　　　　　　　:
　　Plaintiff,　　　　　　　　　　:
　　　　　　　　　　　　　　　　　:
　　v.　　　　　　　　　　　　　　:　　No.
　　　　　　　　　　　　　　　　　:
SAMUEL B. RANDOLPH,　　　　　　 :
　　　　　　　　　　　　　　　　　:
　　Defendant　　　　　　　　　　 :
　　　　　　　　　　　　　　　　　:　　Civil Action

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access*

*Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate*

*and Trial Courts* that require filing confidential information and documents

differently that non-confidential information and documents.

　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　Office of General Counsel

　　　　　　　　　　　　　　Chase M. Defelice, Assistant Counsel
　　　　　　　　　　　　　　Attorney ID No. 209135
　　　　　　　　　　　　　　Office of General Counsel
　　　　　　　　　　　　　　Pennsylvania Department of Corrections
　　　　　　　　　　　　　　1920 Technology Parkway
　　　　　　　　　　　　　　Mechanicsburg, PA  17050
　　　　　　　　　　　　　　Phone: (717) 728-7763/Fax: (717) 728-0312
　　　　　　　　　　　　　　Email: chdefelice@pa.gov

Date:  May 22, 2019

## IN THE COURT OF COMMON PLEAS OF
## MONTGOMERY COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS,

        Plaintiff,

    v.

SAMUEL B. RANDOLPH,

        Defendant.

:
:
:
:
:
:
:
:
:
:

No. 2019-13891

Civil Action

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Complaint was served on

the person indicated below by hand delivery; I also certify that the Complaint was

read and explained to the below-referenced individual:

Samuel B. Randolph, FJ-5881
SCI-Phoenix
1200 Mokychic Drive
Collegeville, PA 19426

Jeanne Welsh CHCA
Jeanne Welsh
Corrections Health Care Administrator
SCI-Phoenix

Date: May 22, 2019



2019-13891-0001  5/22/2019 1:56 PM  # 12319890
Rcpt#2019-13-00939  Fee:$0.00  Affidavit/Certificate of Ser
Main (Public)
MontCo Prothonotary

*EXHIBIT - G*

# IN THE COURT OF COMMON PLEAS OF
# MONTGOMERY COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA       :
DEPARTMENT OF CORRECTIONS,         :
                                   :
           Plaintiff,            :
                                   :
     v.                          :       No. 2019 13891
                                   :
SAMUEL B. RANDOLPH,                :
                                   :
           Defendant.            :       Civil Action

## ORDER

AND NOW, this __22__ day of __May__, 2019, upon review of

Plaintiff's Application for *Ex Parte* Preliminary Injunction and based upon the

Declaration of the attesting physician, it appears that immediate relief is necessary

in order to preserve the life and/or health of the Defendant pending the adjudication

of this matter. Therefore, it is hereby ordered that:

    1.    Pending the adjudication of this matter, Plaintiff or Plaintiffs' designee,

may involuntarily examine and perform invasive diagnostic tests, including blood

and urine tests, on Defendant Samuel B. Randolph, FJ-5881, and may administer

medical treatment, including nutrition, hydration and medication that may, in the

opinion of medical staff, be necessary to preserve Defendant's health and life.

2.    In accordance with Pa. R.C.P. 1531(d), a hearing before this Court on this matter shall be held on the __23rd__ day of __May__ 2019 at __1:30__ am/pm in Courtroom No. __13__, of the Montgomery County Courthouse at Norristown, PA.

3.    The Department is ordered to make Inmate Samuel B. Randolph available for the hearing via video conferencing equipment from SCI-Phoenix.

4.    Counsel for the Department may also participate by video conferencing because of the distance between SCI-Phoenix and the Chief Counsel's office.

5.    Counsel for the Department shall make all necessary arrangements for the hearing via video conferencing.

BY THE COURT:

_____ J.

*EXHIBIT - H*                                    12

## IN THE COURT OF COMMON PLEAS OF
## MONTGOMERY COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA           :
DEPARTMENT OF CORRECTIONS,             :
                                       :
                    Plaintiff,         :
                                       :
            v.                         :      No. 2019 - 13891
                                       :
SAMUEL B. RANDOLPH,                    :
                                       :
                    Defendant.         :      Civil Action

### FINAL ORDER

AND NOW, this **23** day of _May_ 2019, after a hearing, it appearing to the Court that the Defendant, Samuel B. Randolph, FJ-5881, was duly served with the foregoing documents, the Court finds as a fact and as a matter of law that an indefinite injunction is necessary to preserve the health and life of the Defendant.

The Plaintiff or Plaintiffs' designee, through its medical staff, is permitted, when it appears that immediate relief is necessary in order to preserve the health or life of the Defendant due to failure to take food or fluids, to:

1.    Involuntarily examine and perform invasive diagnostic tests, including blood and urine tests, on Defendant and administer medical treatment, including nutrition, hydration and medication as may, in the opinion of medical staff, be necessary to preserve Defendant's health and life.

2.    This Order shall remain in effect as long as Defendant is committed to the custody of the Pennsylvania Department of Corrections.

BY THE COURT:

_____
                                       J.

2019-13891-0006  5/24/2019 9:23 AM  # 12322844
Rcpt#Z3653765  Fee:$0.00  Order
Main (Public)
MontCo Prothonotary  THIS DOCUMENT WAS DOCKETED AND SENT ON 05/24/2019

PA DEPARTMENT OF
CORRECTIONS
INMATE MAIL

RECEIVED
JAN - 3 2020

Samuel Randolph, Pro se
# F J - 5 8 8 1
Box 244
Collegeville, PA 19426

Office of the
Clerk U.S. District
Eastern District
601 Market St
Philadelphia

U.S. MAIL
FIRST-CLASS